EXHIBIT C

**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
RABUN COUNTY, GEORGIA

**2016-CV-0114**
**B. CHAN CAUDELL**
**JUL 18, 2022 11:06 AM**

*Holly E. Henry-Perry, Clerk*
*Rabun County, Georgia*

## IN THE SUPERIOR COURT OF RABUN COUNTY
## STATE OF GEORGIA

STEPHAN PAUL BATCHELDER and
MARGARET MARY BATCHELDER,
Individually, as Administrators of the
Estate of RYAN PAUL BATCHELDER,
deceased,

        Plaintiffs,

v.

MALIBU BOATS WEST, INC., and
MALIBU BOATS, LLC,

        Defendants.

CIVIL ACTION
FILE NO. 2016-CV-0114-C

### ORDER ON MALIBU BOATS, LLC'S POST-TRIAL MOTIONS

This matter is before the Court on Malibu Boats, LLC's Motion for Judgment Notwithstanding the Verdict or in The Alternative for a New Trial. Malibu Boats, LLC[1] ("LLC" or "Malibu LLC") moves for judgment notwithstanding the verdict arguing that there is a lack of evidence to hold it liable, and that the jury's punitive damages awards against it and Malibu Boats West, Inc. ("West" or "Malibu West"), are constitutionally excessive. In the alternative, Malibu LLC contends that it should receive a new trial because of certain evidentiary rulings.

These matters came to a hearing on May 26, 2022. After considering the parties' written submissions, the arguments of the parties, the Court record, and all other matters proper, Malibu LLC's motion is hereby **DENIED**.

---

[1] The jury awarded both compensatory and punitive damages against Malibu Boats West, Inc., and Malibu Boats, LLC. Malibu Boats, LLC filed post-trial motions challenging the verdict against it, and the verdict against Malibu Boats West, Inc. (but only to the extent that Malibu Boats, LLC is liable as a successor for that verdict). As such, the compensatory and punitive verdicts against Malibu Boats West, Inc. are final to the extent that those verdicts can be satisfied by insurance, funds, assets, or any other means external to Malibu Boats, LLC.

## I.    SUMMARY

Malibu LLC argues that there was a lack of evidence that it owed a duty to Ryan Batchelder (or anyone else involved in this incident), that it breached any duty it owed, that any breach of a duty it owed caused Ryan's injuries, and that it was a mere continuation of Malibu West. Malibu LLC also argues there was a lack of evidence to support an award of punitive damages and, even if the evidence were sufficient, the size of the punitive award violates its constitutional due process rights. Despite roughly five and a half years of a heavily litigated case with hotly disputed liability and extensive motions practice, Malibu did not raise any of these arguments until the fourth day of trial, when it first did so by implication only. Malibu LLC's directed verdict and post-trial motions are the first time that it has briefed these arguments in this case.

As it pertains to its alternative request for a new trial, Malibu LLC argues that evidence concerning its reaction to *Bell v. Mastercraft* was improperly admitted, that this Court misunderstood its order on the admissibility of the circumstances of *Bell v. Mastercraft*, that evidence of a lack of other similar incidents involving this specific model boat (the Malibu Response LX) was improperly excluded, that Malibu was prevented from arguing against successor liability, and that the Court should have let it escape from its stipulation that Malibu LLC was a manufacturer for purposes of this case.

Malibu LLC's arguments lack merit. There is overwhelming evidence of a known danger in the Malibu 2000 Response LX that constitutes a safety defect. The freeboard[2] of the boat is, under certain intended and foreseeable loading conditions, lower than the wake created by the normal, expected, and foreseeable operation of the boat, which can

---

[2] Freeboard is the distance between the front tip of the boat (the bow) and the surface of the water. This distance changes depending on the loading of the boat, particularly any loading in the bow area.

result in bow swamping[3] when crossing its own wake at low speeds[4] (which is what happened here). This is compounded by the fact that Malibu designed some of its ski boats, including the Response LX, to have a low-slung bow, or a bow that is low to the water to begin with, and angles downwards towards the water. Malibu chose this design for aesthetic reasons, but did not warn users about the safety implications of its design choice.

Malibu both actually knew and should have known of that danger and defect from the time it first designed the Response LX in 1996, and continuing until the incident in 2014. Malibu made multiple, repeated, and conscious decisions to not warn of that safety defect spanning from when it first released the boat to the public until the incident in 2014. That defect foreseeably caused Ryan Batchelder's death.

Likewise, there was more than sufficient evidence for the jury to conclude that Malibu LLC was a mere continuation of Malibu West, and thus liable for Malibu West's fault with respect to the Response LX and for causing the incident. The evidence establishes that after the hedge fund Black Canyon Capital invested in Malibu, it kept all of the Malibu West shareholders/owners, it kept the same CEO, it kept the majority owner who continued to be a director in the new company, it kept virtually all of Malibu West's employees, and it continued making identical products with the same molds at the same plant with the same equipment at the same facilities. Indeed, Malibu LLC's VP of Design, Dan Gasper (who was also the VP of Design for Malibu West and the person who designed

---

[3] Swamping, or bow swamping, is a term in the ski boating industry that describes a situation where a boat takes on a large amount of water, often resulting in the bow itself diving under the water.

[4] When a ski boat is traveling at speed, it planes out. When on plane, a boat becomes more stable, especially when crossing waves or wake. At low speeds, however, when a boat is off plane, a ski boat becomes less stable. This is also called displacement mode.

the Response LX line) admitted in testimony that Malibu West and Malibu LLC were the "**same company**." Moreover, the CEO of Malibu West, Robert "Bob" Alkema, who continued to be the CEO of Malibu LLC after it was formed by Black Canyon Capital, publicly assured customers that Malibu remained the same company as before (after the transition from Malibu West), and that Malibu was merely taking on additional investors.

Additionally, the punitive damages award was well supported and squarely within constitutional bounds. Compelling evidence established that Malibu made repeated conscious decisions to not warn of a known safety defect, it mocked customers who attempted to raise concerns about bow swamping, it decided to warn about the risks of bow swamping on new boats, including the Response LX, while refusing to warn on identical boats it had already sold, despite knowing that the swamping risk posed the life-threatening hazard of "washing a small child" from the bow. The punitive damages awards against Malibu West and Malibu LLC were both well within a single digit ratio, and when properly compared to the harm suffered by Ryan, both were under a 1:1 ratio that has never been constitutionally problematic.

Finally, Malibu's arguments for new trial misrepresent the record. Any discussion of *Bell v. Mastercraft* was admitted only to explain why Malibu thereafter implemented a bow dip test for its boats, and thereafter installed bow capacity warning labels on their boats. The parties expressly agreed that *Bell* was **not** admitted for purpose of suggesting it was a similar incident. V3-754-55 (discussing the order on MIL No. 15: "lay or expert witnesses can discuss the Bell versus MasterCraft case to the extent that the witnesses will not discuss this case as being substantially similar to the incident subject to this litigation"). And there was no misunderstanding of the *in limine* order by the Court. As expressly stated in the transcript, there was a typo in the defense-drafted order on MIL

No. 15 which resulted in the order suggesting the opposite of what the parties had agreed on the issue of *Bell v. Mastercraft* – that the parties were not going to get into the details of that incident because it was **not** offered as a similar incident. *Id.* And in a separate Order on Plaintiffs' MIL No. 16, issued by this Court on the same day as the MIL at issue, this Court unambiguously and expressly prohibited reference to alcohol use in this case or in reference to *Bell*. *See* February 19, 2021, Order on MIL No. 16, at pp. 5-6 ("Plaintiffs move to exclude any such statements [including "drunk driver"] from any source, including lay and expert witnesses…. Plaintiffs' motion *in limine* no. 16 … is GRANTED."). Put simply, testimony regarding *Bell* was expressly **not** admitted for the purpose Malibu now argues it was improperly admitted, Plaintiffs never improperly referenced *Bell* at trial, Malibu failed to ask for any kind of limiting instruction, and Malibu's counsel plainly violated this Court's order when discussing *Bell*.

Regarding the exclusion of a lack of other incidents, binding Georgia law requires that the circumstances under which there were not incidents be substantially similar to the circumstances in which the litigated incident occurred. The Court gave Malibu ample opportunity to prove that the lack of other incidents occurred under similar circumstances, but it failed to come forward with any evidence on the point, and its employees acknowledged in deposition testimony (not played at trial) that Malibu was unable to do so. Malibu LLC's post-trial attempt to undo its failure to come forward with threshold evidence required for admissibility is unavailing.

Next, Malibu's argument that it was prevented from arguing against successor liability in closing argument is untrue. The Court prevented Malibu from arguing that it was not a manufacturer of the boat, because it had stipulated that it was. The transcript makes it patently clear that the Court permitted Malibu LLC to argue it was not a mere

continuation of Malibu West. The Court simply ruled that Malibu could not contradict the stipulation that it was a manufacturer for purposes of this case. V10-3357 ("Mr. Shannon is intentionally trying to introduce evidence to the jury that contradicts the **stipulation** that they agreed to before trial, which is that the three defendants collectively designed, manufactured, and sold the boat."), 3358 ("The issue [successor liability] is about holding another defendant liable. Right now, the defendants apportion to [sic] fault. That is what successor liability is about. It has nothing to do with the stipulation."). Malibu was free to argue that Malibu LLC was not a mere continuation of Malibu West (and thus not liable for West's fault), but Malibu LLC was not allowed to contend that it was not a manufacturer – because it stipulated it was.

Finally, Malibu's repeated insistence that it mistakenly entered the stipulation is false. The Court has considered this argument on multiple occasions and explicitly found that Malibu entered the stipulation not by mistake, but with the reasoned judgment of Malibu's counsel. That judgment was questioned for the first time on the fourth day of trial by Malibu's appellate counsel. With regard to the process of arriving at the stipulations, Malibu's lead trial counsel put the proposed stipulation back in the CPTO, he edited other stipulations but kept the manufacturer stipulation intact. The parties discussed whether the verdict form could be similarly consolidated but could not agree on the verdict form (because Malibu wanted to apportion among its different entities). The parties agreed to stipulate that all the entities were manufacturers for purposes of this product liability case.

After the verdict form impasse, the parties returned to what they could agree on the stipulations. Plaintiffs' counsel proposed adding a third Malibu entity that was inadvertently omitted to the stipulation establishing manufacturer status. Malibu's trial

counsel accepted that change and submitted the CPTO with the stipulations to the Court. The Court signed the CPTO and filed it with the Clerk in open court. The Court then announced its intention to read the stipulations to the jury, and did so without objection. No issue was raised until the fourth day of trial, after Plaintiffs' opening statement, when Malibu's appellate counsel first voiced disagreement with its lead trial counsel's agreement to the stipulation, and attempted to undo it by calling it a mistake. This Court reviewed the evidence presented on the matter during trial, but outside the presence of the jury, and made a factual finding that there was no mistake. Further evidence presented at the hearing for post-trial motions only further validates that finding. Additionally, amending the pretrial order would have been error, and would have been severely prejudicial to the Plaintiffs who had relied upon the stipulations. Rather than preventing manifest injustice, letting any party out of a stipulation would have caused manifest injustice. During the five and a half years that Malibu's lead trial counsel led Malibu's defense, he never contended that any Malibu entity was not a manufacturer. Instead, Malibu treated all entities as the same. Indeed, despite voluminous and wide-ranging motions for summary judgment, Malibu acted before this Court as if each Malibu entity was the same for the purposes of applying product liability law. Malibu's counsel even stated in pleadings and opening statements that Malibu LLC was a manufacturer for purposes of this case. In sum, the stipulation was sound, voluntarily entered into, reflected the five-plus years of litigation conduct and admissions, and plainly and permissibly established that Malibu LLC was a manufacturer for purposes of this product liability action.

For these reasons and more, which are explained in greater detail below, Malibu's motion is denied in full.

## II.    BACKGROUND

This matter is before the Court after a jury verdict in favor of the Plaintiffs. That posture requires the Court to view the facts in a certain light when evaluating a motion for judgment notwithstanding the verdict. Such a motion, like a motion for "directed verdict **cannot** be granted if there is **any** evidence" supporting the jury's verdict. *Miller v. Lynch*, 351 Ga. App. 361, 366 (2019) (emphasis added; reversing grant of directed verdict). Further, "opinion evidence, circumstantial evidence, presumptions of fact, or evidence subject to more than one reasonable construction ... [may provide] the 'any evidence' creating a jury question." *Id.* at 364. In other words, neither a motion for judgment notwithstanding the verdict nor a "motion for directed verdict should not be granted where there exists **even slight** material issues of fact, because the trial court is substituting its judgment for the jury's." *Id.* For that reason, this Court is obliged to "view the evidence in a light most favorable to the jury's verdict." *Vojnovic v. Brants*, 272 Ga. App. 475, 475 (2005). So viewed, the evidence shows as follows.

### A. Underlying Facts

In the late 1990s, Malibu saw that its competitors were offering ski boats with seating in the bow. V7-2146 (Malibu VP of Design Dan Gasper noticed competitors had open bow boats). Concerned about losing market share, it decided to rush a similar boat to market. V7-2136 (Malibu VP of Design: "the role ... is just to make sure that we're designing and developing a product that will – that our customers will desire and prefer to have before our – rather than our competition's product"). However, unlike its competitors—who used engineers and carefully modified the weight distribution and design of their boats to accommodate the additional weight in the bow—Malibu did no such thing. V4-1132-35 (Testimony of Borden Larson). And that was particularly

problematic because Malibu's original design already had a low bow freeboard because Malibu had deliberately designed it that way for aesthetic reasons. V4-1049 (Plaintiffs' expert Bryant Buchner testifying to the danger of the low freeboard); V7-2210 (Malibu employee Dan Gasper explaining that it did not like warning labels for aesthetic reasons). The result was a ski boat with a very low bow freeboard in general, and especially when foreseeably loaded:



Pl. Exh. 62, p.1

And despite publicly claiming that its boats were expertly engineered, it had no engineers on its design staff. Malibu's Vice President of Design, Dan Gasper, has a high school education, with no formal training or education in engineering or design. V4-1132-35 (Testimony of Borden Larson); V7-2143 (Gasper describing background). But even without tailored education, he recognized the problem. When the CEO of the company, Bob Alkema, told him to add bow seating to the Response (thus making the Response LX), Gasper expressed an "engineering concern" for bow swamping. V6-1719 (Alkema relaying conversation that weight in the bow was a "primary concern" which was recognized as an "engineering concern"). CEO Bob Alkema also had only a high school education, with no formal training or education in engineering or design. V6-1715-16. Despite their lack of education or training in engineering or design, Alkema and Gasper

led the design of Malibu's boats for decades, without hiring an engineer or seeking the services of a third-party engineering firm to assist them. V6-1717:11-14.

Gasper candidly recognized that taking a boat designed to have no weight in the bow, but then adding seats (and thus weight) to the bow could cause problems with weight distribution. Despite that realization and collective recognition of the potential hazard, they did nothing. CEO Alkema instructed Gasper to make the changes without modifying the boat to accommodate adding weight to the front of a design that was never designed to hold weight forward of the cockpit, and Gasper did just that. He cut a hole in the closed forward deck of the bow of the boat, installed seats, and then when that "worked" it became the Malibu Response LX, that Malibu sold to its customers. V3-738 (describing ad hoc cuts to add the bow seating). Malibu made no additional changes to the boat to account for the additional weight that was being added to a boat that was never designed to hold it.

This design change resulted in bow seating that was isolated from the rest of the boat. The only way to get from the bow seating to the cockpit of the boat was to climb up and on top of the dashboard of the boat, and travel through a 16" door that was cut into the windshield and locked from the inside of the cockpit (*i.e.*, the windshield door could not be unlocked by a bow occupant at any point, including during an emergency). V6-1633 (Plaintiffs' Expert Laux).

In sharp contrast, Malibu's main competitor, Correct Craft (which operates in this market as Ski Nautique), made an identical design change to a similar boat (the Ski Nautique Open Bow) that was a competitor to the Malibu Response, and it did so years before Malibu changed the Response to the Response LX. V4-1139 (Borden Larson explaining design of Ski Nautique Open Bow in 1991). Correct Craft utilized engineers to

oversee its design processes, and design the testing for its boats. *Id.* (noting design was supervised by an engineer). Correct Craft's method for undertaking this change could not have been more different than that of its competitor Malibu. With the specific design change at issue, Correct Craft recognized that it was adding weight to the bow in a design that was not originally intended to carry weight in that area. It then carefully considered what problems that would cause, designed around those potential hazards, and then tested the boat to confirm that its design accomplished that goal. V4-1122 (Larson discussing changes to modify boat's center of gravity); 1124 (Larson discussing drainage); 1127 (Larson discussing weight distribution of passengers and testing).

Correct Craft's design changes fell into two general categories: those that addressed the weight, and those that addressed the potential for additional water in the bow. As for the additional weight, Correct Craft set out to counteract that additional weight up front by moving as much weight as possible towards the back of the boat. To that end, Correct Craft moved the roughly 900 lb. engine back 6", and moved the helm (and thus, the driver/passenger seating area) back 12". V4-1121-23. As for the second part, the additional water, Correct Craft added two drains that went directly out of the side of the boat, a 3x8s" drain that went to the bilge pump (so that it could be pumped overboard and out of the boat), and an additional bilge pump to pump the additional water that would need to be eliminated as a result of this new and open bow seating area. V4-1125. As to that last part, Correct Craft anticipated additional water in the bow seating area not just because of water coming over the bow—which is something that it designed against— but for things as innocuous as rain that could allow water to accumulate in the bow seating compartment if there were not effective means to eliminate it. V4-1124, 1126.

Finally, Correct Craft, at the direction of its engineers, applied an on-product warning label in two different areas of the boat, warning passengers that the bow weight should not exceed 300lbs based on the design of the boat, something that it had done for years at that point. V4-1127 (Larson explaining that engineers determined with the back of the boat empty that the max safe weight in the bow was 300 pounds, so the warning label set that as the max safe weight in the bow).

An important aside is necessary here. Bow swamping is a known hazard in the boating industry generally, and specifically in the ski boating industry. The risk of potential harm is serious. Malibu admittedly knew of this risk, and of the serious consequences that could result in the event of a bow swamping incident. For example, Malibu admits that a bow swamping incident could cause a bow occupant to be washed overboard, which could put them into the path of a spinning propeller. And Malibu knows that putting an occupant into the path of a spinning propeller, could result in serious injury or death. . Pl. Exh. 137, p. 37 (MALIBU 000674 warning to not get in the water when the propeller is running).. This is true of anyone, but especially for a child. *See* V4-1129 (discussing additional concern for child safety in swamping context). And, as noted herein, Malibu marketed its bow seating area as not just suitable for children, but as intended for them. *See, e.g.,* V6-1711 ("And from the beginning, did you, and did the company attempt to portray Malibu and the products that [you] produced[,] the Malibu boats[,] as family friendly boats? A. Yes."); V7-2225, p. 13.

But when modifying the Response to the Response LX, and despite knowing that there was an increased likelihood that a boat like this could take on water, Malibu failed to implement economical, technologically feasible, and simple designs that would account for increased water in the bow seating area; designs that it could have observed in, and

copied from, its main competitor Correct Craft. For example, Malibu did not move any weight towards the back of the boat to account for the increased weight in the bow in a design that was not intended to hold weight in the bow. V4-1133 (no engineers supervising design process). Malibu did not add drains that went directly to the outside water. Malibu did not add a drain that went directly to the bilge area. And Malibu did not add another bilge pump to account for the water that would be added to the boat through the now-open bow seating area. Instead, it created holes that required water entering the bow to drain along the floor of the boat from the bow seating area, all the way to the back of the boat, where it would drain down into the hull of the boat, and have to gravity feed back towards the bow of the boat in order to be pumped out by the bilge pump. The problems of this design were compounded by the fact that Malibu designed the boat to have a bow-down orientation (*e.g.*, water cannot flow uphill by force of gravity alone, and the bow of the Malibu Response LX pointed downward by design, especially with any load in the bow). *Compare* V4-1125 (Larson explaining how Correct Craft added a second bilge pump on all open bow boats) *with* V3-1339-40 (Expert Schofield explaining how Malibu's design left water to slosh around bulkheads in a circuitous path to get to the one bilge pump located under the forward aspect of the engine).

But Malibu did more than sell these Response LX boats to its customers. It specifically advertised the boat as a family-friendly model, and encouraged customers to put their children in the bow of the boat. V6-1711 ("And from the beginning, did you, and did the company attempt to portray Malibu and the products that [you] produced[,] the Malibu boats[,] as family friendly boats? A. Yes."); Exh. P-78, Supp. Volume, pp. 688-92, 811-822; 794 ("By opening the bow on the competition-quality Response, Malibu created more room for the family . . . ."). Malibu even referred to the new and isolated bow seating

area as the "playpen" seating (because it was intended for children), or the "hot tub" area because it was known to take on water. V4-1713 (describing bow seating as "playpen seats or the hot tub seats").

Despite that, the evidence showed that Malibu did not do any formal, documented safety testing of the boat, and Malibu had no test protocol or records of any testing. V4-1138-39 (Larson opining on the informality of Malibu's "testing"). The only "testing" Malibu ever did was by offering to let some of its employees use the boat recreationally, as a benefit of their employment. *Id.* But the evidence showed that this was far below what a reasonable manufacturer would do. The industry standard at the time was rigorous, worst-case-scenario testing that should have been specifically crafted and supervised by an engineer or naval architect to test the foreseeable problems and potential weaknesses of the design, and document it for design feedback. *See* V6-1136-37 (Larson describing proper testing). Malibu did no such thing. Indeed, Plaintiffs' expert naval architect performed the testing that Malibu should have performed. Within minutes, and with only 150 pounds of weight in the bow (when Malibu claimed based on later testing it was safe up to 350 lbs.), he discovered that the Response LX would swamp completely when crossing its own wake at low speed. V5-1360-61 (Expert Schofield explaining how the boat completely swamped crossing its own wake with 150 pounds in the bow). The record supports that this is an extremely dangerous safety defect that was reckless to release to the public. V5-1381-82 ("reckless and irresponsible" to design boat that "would not be able to cross its own wake without shifting water aboard").

The defective design and inadequate testing were quickly apparent to Malibu. Multiple Malibu employees admitted to experiencing numerous occasions of water coming over the bow of the Response LX. *See, e.g.*, V7-2196 (Malibu employee admitting

he experienced water over the bow at least 50 times). Not only that, in 2005, Malibu's Australia distributor notified it of a widespread problem with a sister model (the Response LXi) "duck diving" (taking water over the bow) and swamping. Pl. Exh. 137, pp. 24 (MALIBU 003298) - 28 (MALIBU 005093_000003); Pl. Exh. 138, p. 11. That is important because the LXi is substantially similar to the LX in all aspects that are material to the swamping defect. V4-1074 (LX and LXi are substantially same boat); V8-2635 (VP of Product Design admitting LX and LXi were very similar); *see also* Docket 732, Deposition of Matthew Slayden, p. 118 (the LX and LXi are substantially similar from an engineering standpoint) (not presented to the jury). Indeed, if anything, there was evidence offered to the jury that the LX had a lower bow freeboard than the LXi, meaning the defect was more severe on the LX than it was on the LXi. Pl. Exh. 138 (showing that LX had, if anything, more dangerously-low freeboard than LXi). Because of the defect, the Australia distributor started putting warning labels on the boats on its own, and suggested Malibu do the same in the United States. *See, e.g.*, V8-2379. Malibu U.S. responded to the notice of that hazard, and the recommendation to implement on-product warning labels, by mocking the customers who reported the problems. Malibu's US employees suggested that "fatties" were in the boat and that they should try the "Atkins diet." Pl. Exh. 138. This is especially confusing because the evidence showed that the bow seating area in the Response LX was small and difficult to access and, as a result, it was often used as a place for children. V6-1639 (Malibu "knew that children would be getting up there. That's — you know, that's exactly the sort of place a kid wants to be."). Those comments demonstrated that Malibu was not going to change the design of the boat even when it knew that customers were experiencing the dangerous situation of taking water over the bow.

In other words, the evidence showed that Malibu knew of the defect the day it designed the Response LX in 1996 (*i.e.*, the engineering concern) but did not warn, it also is charged with knowledge of the defect because it would have learned of the defect if it had done the proper industry standard testing that reasonable care required (according to Borden Larson and Naval Architect Schofield), and it knew of swamping problems with the materially identical Response LXi from its Australian distributor—all by 2005—but Malibu still refused to warn its customers of that known safety hazard. And that was a particularly inexplicable decision because, at the same time, it had recognized a defect where the Response LX was causing carbon monoxide poisoning and was sending warnings to its previous customers about that hazard. V7-2178. Indeed, Malibu clearly had the ability to get warnings to previous customers – the very boat involved in this case was sold approximately five years before that warning was issued but had that warning applied through Malibu's post-sale warning process. V6-1642:6-14. But still Malibu deliberately decided not to warn about the bow swamping defect.

In about 2006, Malibu made a deal with a hedge fund to secure an investment so that Malibu could grow into a yet-larger company. V8-2618. And although Malibu structured that transaction as an asset purchase that nested ownership in newly created LLCs, the overwhelming evidence was that it remained the exact same company, simply with new investors. V8-2619-21. Indeed, all of the owners of the old entity, Malibu West, became owners of the new company, Malibu LLC, through a holding company. *Id.* The CEO remained the same, all of the employees stayed on, all of the plant, property, and equipment stayed the same. *Id.* Some of the executive level employees of Malibu West, including VP of Design Dan Gasper, remaining in their same positions at Malibu LLC. *Id.*

Malibu kept making the exact same boats afterwards.[5] *Id.* Indeed, the Response LX model line did not change from 2000 to 2014. V6-2167. The person with ownership control of Malibu West remained as a director of Malibu LLC. V8-2621. Indeed, the company remained so identically the same that VP of Design Dan Gasper testified it was the same company. V6-2620 ("So, really, all that changed was the name of the company, right? A. Yeah, I guess so."). And Malibu deliberately banked on the goodwill of the Malibu name, communicating to the public that, despite taking on hedge fund investors, nothing was changing and it remained the "same Malibu." Pl. Exh. 78 (Deposition Exh. 3). This reality was so pervasive in the evidence that even Malibu's lead trial counsel admitted in judicio in his opening statement that it remained the "same company" despite the fact that it was technically "different companies." V3-690 (Malibu's counsel during opening argument). Simply put, Malibu remained the same company making the same products at the same facilities with the same employees and substantially the same owners and leaders. And it told the public and admitted as much.

In fact, after Malibu LLC became the operative entity for Malibu, it continued its practice of warning of defects with boats that it had previously sold to the public. *See* V7-2178, 2191 (discussing multiple times that Malibu had warned of defects on already sold boats). And since virtually all of the employees, and all of the key leaders remained at the company, Malibu LLC had all the knowledge of the defect with the 2000 Response LX and the record showed that it consciously decided not to warn of the defect that Malibu

---

[5] Also, the old entity, Malibu West, wrapped up operations and then liquidated and dissolved in about 2008. V6-1743-44 (ceased operations after sale); *see also* Malibu's Counsel purported "Correction to Entry of Appearance" filed September 24, 2021.

West had possessed or been charged with. But that was not all the knowledge Malibu possessed under the LLC regime.

In 2011, a jury in California rendered a verdict against Malibu's competitor, MasterCraft, when the bow of a boat swamped, causing serious injuries to two occupants. The case was *Bell v. Mastercraft*. There was extensive testimony that the *Bell* case woke up the ski boat industry to safety issues generally, and bow swamping and consumer warnings generally. As a result, multiple manufacturers coordinated on both legal and practical strategy, using industry organizations as the vehicle for collaboration. Unfortunately, however, that collective effort was not to make their boats safer, but it was to coordinate their practices to shield themselves from future liability. *See* V8-2382-23, 2386; Pl. Exh. 138, p. 13 ("Please remember that the main reason for this project was to create consistent messaging so that one of your companies cannot be used against the other in a litigation setting.").

After *Bell* in 2011, Malibu implemented bow dip safety testing for all of its ski boats, and it adopted bow capacity safety warnings for its ski boats. V8-2502. What that testing required was not well understood by Malibu employees, though. Employees testified that if even a drop of water touched the vinyl of the bow seating that was a "fail." V7-2244 (Malibu employee explaining that "one drop, any water" that "touch[es] the vinyl" of the seats is a fail). But Malibu's documentation was written to provide it more cover than that. That documentation shows that a boat passed Malibu's new bow dip test unless enough water entered the bow to "displace an occupant of average weight." Pl. Exh. 137, p. 8. In other words, a boat passed inspection if it took on enough water to wash out only a small child. *Id.*

After that testing, Malibu decided to place a warning in the passenger compartments of its ski boats because of the swamping hazard, warning users that certain weight limits should not be exceeded in the bow. *Id.* But the evidence at trial demonstrated that the warning Malibu drafted and placed in boats later manufactured and sold was, itself, deficient. The warning provided that no more than 350 lbs. should be placed in the bow. V7-2167. Plaintiffs' experts, however, showed that the swamping defect occurred even with only 150 pounds in the bow. V5-1360-61 (Testimony of Expert Schofield). They also opined that it was not safe for anyone to sit in the bow while it was underway. *Id.* Accordingly, an appropriate warning label would have been that no one should sit in the bow of the Response LX while it was underway. V5-1360-61 (Expert Schofield); V6-1642-44 (Expert Laux).

Despite the fact that the Response LX was identical from the time that it implemented the design change in 1996 until 2015 when it was discontinued, the record shows that Malibu decided to only warn on new boats manufactured after its 2011 decision to implement those warnings in the first place, even though (1) the previously-sold boats were identical to the boats receiving a warning, (2) the exact same safety hazard existing on those earlier-sold boats, and (3) Malibu knew that it had an obligation to warn previous customers. V8-2426-33 (decision to warn in 2011 going forward); V6-1813 (admission that same hazard existed on earlier models); V7-2287 ("the same hazard that Malibu was trying to prevent when it decided to put the bow limit warning labels in the boats in 2011 … **that same issue, that same concern existed back in 2000**." (emphasis added)).

That was not a one-time decision by a low-level employee. Malibu's Board of Directors considered whether to warn previous customers who had bought previous

model years but decided not to do so on no less than three occasions. Pl. Exh. 137, pp. 1-8. Instead, Malibu simply flagged that it should ask its attorney and insurance companies what to do. *Id*. The Court prevented that evidence from going to the jury, and the mention of insurance was redacted from the exhibits that went to the jury, but Malibu never offered evidence about the course that it's insurance company (or companies) recommended that it take. Nevertheless, the jury could interpret this as Malibu being focused more on potential future liability than it was on the present safety of its users and customers.

Malibu argues that seeking the advice of its attorneys in this process demonstrates diligence in its decision making. But Malibu did not offer into evidence anything about what the attorney was specifically asked, what the attorney's advice was, or even who the attorney was. At a hearing on post-trial motions, Malibu's appellate counsel attempted to speculate that the attorney's advice could have been that they do not need to warn about older models because it was not liable for pre-2006 models. But not only is there no evidence to support that conjecture, it is also contrary to the evidence. The testimony and documentary evidence are that Malibu did not warn about **any** pre-2011 models, including the Response LXs that were indisputably made in 2006-2010 under the LLC regime, which were identical to those made pre-2006. V6-1866 (never sent labels to existing owners); V6-2167 (2000 model is the same design as the 2014 model). The import of the testimony was plain: Malibu made multiple, repeated, conscious decisions to not warn of a known safety defect in the 2000 Response LX from 2011 to 2012. And Malibu knew exactly how serious this hazard was. It specifically contemplated that bow swamping incidents would wash children out of the bow Exh. 137, p. 8. And it knew that someone washed into the water beside the boat was at risk of contacting the propeller, which meant certain serious injury or death. Pl. Exh. 137, p. 37 (MALIBU 000674).

Malibu became a publicly traded company a few years after those decisions. Specifically, Malibu began the process for an initial public offering ("IPO") in 2014, and became listed on the NASDAQ stock exchange. V-9-3069-70. But the way it did that was by creating "Malibu Boats, Inc." as a parent company over Malibu Boats, LLC, and Malibu's CFO's testimony is that LLC remained the operative entity for running the business and that LLC was the entity that made the decisions not to warn in 2011 and 2012. *Id.*

In the summer of 2014, the Batchelder family arrived at Lake Burton for a family vacation. Stephan and Meg Batchelder arrived with their children, Ryan and Josh, while Stephan's brother Darin arrived with his wife and their children, Zack and Kayla. The family rented a 2000 Malibu Response LX from a local marina and enjoyed a few days on the lake. Later in the week, Meg's uncle Dennis Ficarra and his wife joined the family.

On July 13, 2014, Darin and Uncle Dennis took the four kids out on the lake for a day of watersports. After a few hours, the kids were beginning to get tired and were discussing whether to ski a bit longer or head back to their rented home. At that time, all four kids were seated in the bow and their combined total weight was 322 pounds. V6-1658. Seven-year-old Ryan Batchelder was wearing his life jacket and seated to the left of his brother and cousins. Darin and Uncle Dennis were seated in the cockpit while Uncle Dennis drove. Because the kids were debating whether to go back, Uncle Dennis began to operate the boat slowly in displacement mode[6] in large circles in the lake. After completing the second circle, the boat traveled over the wake created by completing the

---

[6] When a boat is moving fast, the water pushes it up out of the water and it skips along the surface of the water. When a boat is operated slowly, it sits in ("displaces") the water and the hull of the boat pushes through the water rather than skips over it. That slow operation is normal when picking up a fallen water skier or coming into the marina, and is called displacement mode.

first circle, and down into the wake created by making the second circle. At that point, the wake was larger than the loaded bow of the boat could overcome. The wake crashed over the low-slung bow and swamped the boat so extensively that it began to drive downward, like a submarine, towards the bottom of the lake. To prevent the boat from sinking, Uncle Dennis quickly popped the boat in reverse for 1-2 seconds to pull it out of the nosedive (which the boat manual suggests for quickly stopping, *see* Pl. Exh. 137, p. 38 (MALIBU 001590)) and then cut the engine off. V7-1996.

Unfortunately, the wake that swamped the boat had washed seven-year-old Ryan out of the left side of the boat, opposite Uncle Dennis who was driving. Ryan was wearing a life jacket, so he floated alongside the left side of the boat. As he traveled towards the back of the boat that was moving forward alongside him, the propeller[7] sucked his body underneath the boat. Ryan's interaction with the propeller was truly horrific. The first part of Ryan's body to contact the propeller was his left foot. The quickly-spinning propeller then iteratively chopped away at his left leg until it reached roughly his hip, at which point it latched onto his life jacket and wrapped his body around the drive shaft of the propeller. This caused Ryan's abdomen to be exposed to the propeller, which resulted in the propeller opening up his abdomen and exposing it to the lake water. V4-1197 (medical examiner testimony); Plaintiffs' Exhs. 2 (photos from autopsy); 12 (DNR photos); *see generally* V3-764-877 (testimony of Plaintiffs' expert Bryant Buchner).

According to, Dr. Keith Lehman, the medical examiner from the Georgia Bureau of Investigation who performed the autopsy in this case, Ryan probably lived for 60-180

---

[7] The Malibu Response LX is an inboard engine boat, meaning that its engine is not attached to the back of the boat, but it is fully encased within the hull of the boat. As a result, the propellor for this boat is located underneath the bottom hull, on the back half of the boat. V3-798 (Expert Buchner testimony)

seconds before dying due to an inextricable combination of blood loss and drowning, during which time he could have felt pain. V4-1200 (testimony of Medical Examiner on how long Ryan likely lived after getting tangled in the propeller). The evidence shows that the last minutes of Ryan's life were spent with him having been horrifically mutilated, a propeller lodged in his abdomen, bleeding out, and unable to breath while his older brother, cousins, and uncle screamed for him above the water.

Ultimately, the Department of Natural Resources officer who responded had to pull the boat out of a water on a lift. He was unable to separate Ryan's body from the propeller, so he had to cut Ryan's body apart with trauma shears in order to do so. V4-1192:5-6.

### B. Procedural and Pretrial History

This lawsuit was filed on May 9, 2016. When Malibu answered, it was represented by Parks Stone from the law firm of Gordon & Rees. But a few months later, Malibu replaced Gordon & Rees with Robert "Bobby" Shannon, who was then with the firm that is now known as Hall Booth Smith, P.C. *See* Notice of Appearance and Substitution of Counsel, filed October 4, 2016. Mr. Shannon then served as lead trial counsel for the next five and a half years leading up to the trial. During that time, Malibu consistently defended itself as if the three Malibu entities were essentially the same for the purposes of applying Georgia product liability law to this case.

Indeed, Malibu filed comprehensive motions for summary judgment on multiple bases, but never contended that any of the Malibu entities were not a manufacturer of the 2000 Response LX for purposes of this product liability case. Nor did they ever contend that Malibu LLC and Malibu Inc. were not responsible for Plaintiffs' claims regarding the Subject Boat. *See* Malibu's Brief in Support of MSJ, filed May 1, 2020. Malibu had

previously admitted in judicio in its earlier appeal that the "2000 Response LX boat [was] manufactured by Malibu Boats" which, along with the name "Malibu," was used to collectively refer to all three Malibu Defendants throughout the brief, without any delineation or distinction between them. *See* Case No. A18A0881, Brief of Appellant Malibu Boats, LLC, at pp 1, 4, 7, filed December 21, 2017. In over a half decade of litigation conduct by Malibu's lead trial counsel, it was admitted—not disputed—that the three Malibu entities were collectively responsible for the design, manufacture, and sale of the subject 2000 Response LX for purposes of this product liability case.

In preparation for trial, the Plaintiffs proposed some streamlining stipulations to simplify the presentation of evidence and streamline the issues that the jury must resolve. Malibu initially resisted any stipulations, but eventually agreed to enter certain stipulations proposed by the Plaintiffs (while rejecting or modifying the remainder). *See* Pl. Exh. 1003-1005. In doing so, Mr. Shannon inserted a number of stipulations into a proposed consolidated pretrial order, including a stipulation that all of the Malibu entities were considered a manufacturer of the subject boat for the purposes of applying Georgia product liability law to this case. *See* Pl. Exh. 1003-1005.[8] At that same time, Mr. Shannon omitted and modified other proposed stipulations. But Mr. Shannon demonstrated his agreement with the stipulation that Malibu LLC was a manufacturer by removing it from being crossed out, keeping it intact without any edit or modification, therefore listing it as an agreed-upon stipulation. In response, Plaintiffs drew Malibu's attention to that stipulation by attaching a note to it in Microsoft Word. In that note, Plaintiffs asked whether Malibu would agree to have all Malibu entities on the same line on the verdict

---

[8] *See also* Pl. Exh. 1003.1, 1003.2, 1003.3, 1003.4, 1003.5, 1003.6; the Court also heard counsel state in their place at trial and at the hearing on post-trial motions.

form, because that was a logical continuation of the stipulation. Malibu considered Plaintiffs' request but ultimately opted to keep the stipulation while listing each Malibu Defendant on a separate line item on the verdict form. *Id*. When no agreement was forthcoming on the verdict form, the parties shifted back to the stipulations. *Id*. Plaintiffs then noticed that the stipulation at issue inadvertently left out Malibu Boats, Inc. Plaintiffs then proposed a modification of the stipulation, and they did so by adding Malibu Boats, Inc. to the stipulation using the track changes feature of Microsoft Word, which would draw Malibu's attention to it. Malibu reviewed and accepted that change in Microsoft Word before submitting the CPTO to the Court. *Id*. Malibu's appellate counsel was included on all of the aforementioned e-mails, and did not express any reservation or objection to the stipulations.

The Court filed the CPTO with the Clerk in open court at 8:42 a.m. on August 16, 2021, the first day of trial, and informed the parties on the second day that it intended to read the stipulations to the jury the next day after opening statements. V2-520:15. On the third day of trial, the Court began by reading the stipulations to the jury, including the stipulation that all the Malibu entities were a manufacturer of the boat for purposes of this case. Malibu never objected. V3-760. Then, on the fourth day of trial, the Court and parties awoke to a late-filed motion and an argument by Malibu's appellate counsel that its lead trial counsel had made a mistake in agreeing to the stipulation. V4-931.

The Court received documentary evidence, including emails and drafts of the consolidated pretrial order, *see* Exhs. P-1003-1005, and heard the testimony of counsel as they stated in their place. V4-932-974. This Court carefully considered Malibu's argument, took two days to consider the issue and, on the sixth day of trial, made a finding of fact that there was no mistake or confusion, and that Malibu's collective team of

attorneys deliberately and intentionally entered into each of the stipulations after they considered their clients' various options. V6-1564-65. Indeed, during its opening statement, Malibu's lead trial counsel had again made an admission in judicio noting that, although the Defendants were "different companies," the jury was going to "hear Malibu West, and Malibu, LLC, and Malibu, Inc., **because they're the same company**." V3-690.

Finally, Malibu failed to show that amending the pretrial order was necessary to prevent manifest injustice. To the contrary, the stipulation was consistent with a many years of litigation positions, multiple admissions in judicio, the conduct of the parties during that time, and was agreed to and accepted by Malibu's team of counsel in a comprehensive editing process that demonstrated Malibu's intentional and deliberate choice to do so. Amending the pretrial order to undo a stipulation to an admitted fact would have been manifest injustice to the Plaintiffs, who had reasonably relied on Malibu's admissions and stipulations in preparing for trial, and who had, by that time, delivered their opening statement to the jury in reliance on the stipulations.

### C. Trial

Trial took eleven full days, from voir dire until the jury's verdict that was rendered on August 28, 2021, a Saturday evening.

The parties conducted voir dire on the **first two** days of trial. *See* V1-V2. Despite flagging concerns with that process in its initial post-trial pleading, Malibu never developed any claim of error and has abandoned any such claims in its supplemental briefing.

On the **third** day of trial the parties gave their opening statements. *See* V3-681. During opening, Malibu's counsel stated early on that the Malibu entities were different

companies but also the same company, V3-690, and later attempted to bolster the character of Malibu's CEO by explicitly referring to his religiousness, an objection that the Court sustained. V3-711. Malibu's counsel talked about the *Bell v. Mastercraft* case, explicitly referring to it as a drunk-driver case in violation of this Court's Order on MIL No. 16. V3-752.

Once the opening statements were complete, the Court instructed the jury on the parties' stipulations by reading them from the Consolidated Pretrial Order entered by the Court on the first day of trial. V3-760-762. After that, Plaintiffs called expert Bryant Buchner as their first witness. V3-764. Mr. Buchner testified about the problems with the design of the 2000 Response LX, the mechanics of how the swamping event and Ryan's contact with the propeller occurred, and how Mr. Ficarra's operation of the boat and his reaction to stop the submerging event was reasonable. V3-764-877. Mr. Buchner further testified that the center of gravity, the center of buoyancy, and the center of flotation are critically important, and foundational, to determining whether any boat can operate safely under various loading configurations that are intended by a boat company. V2-820-33. Malibu began its cross of Mr. Buchner that afternoon and then the trial broke for the day.

On the **fourth** day of trial, the parties took up the stipulation issue described above. During that colloquy, counsel for Malibu admitted that it heard the stipulations read to the jury but did not object. V4-935. After hearing argument and evidence on the stipulations in the pretrial order, the Court took the matter under advisement, and the cross-examination of Mr. Buchner continued. V4-976. Plaintiffs then made a proffer of another swamping incident in a Malibu boat that caused the death of a child (the Kreusch incident), which is an incident they contended is substantially similar. V4-1069-76

(Testimony of Buchner). The Court denied a motion to reconsider exclusion of that evidence, and the Plaintiffs proceeded to conduct a brief redirect of Mr. Buchner before he stepped down.

Plaintiffs then called expert Borden Larson, who testified about the care ordinarily exercised in the industry when converting a closed-bow boat to an open-bow boat with bow seating. V4-1108. That included a design process supervised by engineers, moving the control console, seating, and engine rearward to offset the newly-added weight up front and adjust the center of gravity rearwards, adding drains to the new bow seating areas to account for additional water accumulation in that area, adding a secondary bilge pump to pump the additional water out of the boat, and conducting rigorous worst-case-scenario testing documented and supervised by engineers. V4-1108-1140. He also testified that Correct Craft saw the need for warnings in this redesign process because too much weight in the bow can be dangerous, and people do not intuitively understand how much that can or should be. V4-1126-1127. As a result, Correct Craft's engineer developed warnings about safety in the bow area generally, including a warning about the bow capacity, and a warning that children 10 and younger must have an adult with them to use the open bow area. V4-1128-1129. Correct Craft then installed the warning in two areas of the boat, so that it could be seen by people climbing from the cockpit into the bow, and also separately by people entering the bow from outside the boat, like those standing on a dock, for example. V4-1128. Mr. Larson also testified that Malibu did none of those things, even though doing so would not have been complicated or burdensome for a ski boat manufacturer of their size and position in the market. *Id.*

Plaintiffs next played the video deposition of Officer Kyle Shook of the Georgia Department of Natural Resources, who responded to the scene post-incident, V4-1178-

1191, the medical examiner Dr. Keith Lehman, who explained the cause of death and the fact that Ryan likely lived for a 60-180 seconds after contacting the propeller, during which time he could have felt pain, V4-1192-1210, and Kayla Batchelder, Ryan's cousin who was in the boat during the swamping incident. V4-1211-1215.[9]

On the **fifth** day of trial, the Plaintiffs called their expert Mr. Rob Schofield, an engineer who has achieved the designation of Naval Architect. V5-1324. Mr. Schofield tesified about the swamping defect in the 2000 Response LX, and that Malibu should have known about it. V5-1338-41. He opined that this boat was incapable of crossing its own wake when loaded in a foreseeable manner, which is a reckless and irresponsible design. V5-1354-55. He showed pictures of swamping occurring at 5-7mph with only 150 pounds in the bow of the boat, and testified that it took him mere minutes to almost completely swamp the boat when he began conducting normal and ordinary bow swamping testing maneuvers on the boat:

 

---

[9] The Court dealt with a motion for mistrial for this witness, who became very emotional in her video deposition testimony. The Court found that a mistrial was not appropriate because of a mistake in playing certain parts, the brief time it was played before the jury, the fact that the Court had the videographer turn it off, and the fact that Malibu was aware in advance exactly what the video deposition testimony would be and did not object. Instead, the Court gave the jury a curative instruction for the jury to disregard the testimony. V5-1324. Malibu LLC has not raised this issue in its supplemental briefing.

Pl. Exh. 62, at p. 9-10.

Mr. Schofield also offered extensive testimony about what Malibu should have foreseen, did foresee based on his review of the materials, and what it should have done but ultimately elected not to do. V5-1364-70. Mr. Schofield opined that the boat was defective because of a freeboard that was too low when combined with an open bow, and it was also defective for failing to have proper warnings and instructions. V5-1373-77. He concluded that a warning should have completely prohibited passengers in the bow while the boat was underway. V5-1379-82. Toward the end of the fifth day of trial Plaintiffs called Stephan Batchelder, Ryan's father, as a fact and damages witness. V5-1501-1532.

On Monday, August 23, 2021, the **sixth** day of trial, Plaintiffs called Krista Jabcuga, Ryan's first grade teacher, as a damages witness, V6-1608, and then put up Dr. Lila Laux, their expert on warnings. V6-1621-97. Dr. Laux opined that the boat lacked proper warnings, V6-1642-43, which made the boat unreasonably dangerous, V6-1644, that proper warnings would have prevented the incident, V6-1643-44, and that Malibu knew of design defects and life-threatening safety hazards before Ryan died. V6-1644-45. Specifically, Dr. Laux opined without objection that Malibu's warning decisions were reckless and thoughtless and demonstrated that Malibu "didn't care about the safety of the people who were using their products," and that the design defects, including a lack of necessary warnings, made it likely that a bow swamping incident like this one would occur. V6-1645-46.

Plaintiffs next called Kerri Flaum, a friend and neighbor of the Batchelder family, as a damages witness, V6-1698-1705, before playing the video deposition of former Malibu CEO Robert "Bob" Alkema. V6-1707. Mr. Alkema's testimony explained how the Response LX was designed and built, V6-1712-14. He also testified that he was not aware

of any testing documentation for the boat. V6-1720. He confirmed that Malibu West ceased operations in 2006 after its purchase by Malibu LLC. V6-1743-44. Mr. Alkema admitted that all of the safety hazards that existed in 2011, when Malibu first decided to warn customers and users about them, had existed since Malibu first released the Response LX in 1996. V6-1813. In other words, Malibu decided to warn about the swamping defect in its 2012 Response LX, but it deliberately chose not to warn owners and users of older boats than that model year, including the 2000 Response LX, despite actively knowing that every Response LX ever made had an identical swamping defect. *Id.* Mr. Alkema also estimated that Malibu could have warned for $2 to $6 dollars per warning label. V6-1814.

Plaintiffs next played the video Malibu's Director of Customer Services, Mark McLemore. V6-1824. He explained that Malibu has a database of boat purchasers going all the way back to the beginning of the company, and that Malibu can use that data to warn Malibu customers who purchased boats in the past. V6-1828. He agreed that Malibu's customers reasonably expect Malibu to notify them if it later learns of a safety issue with a boat they bought. V6-1844.

After that, Plaintiffs played the video deposition of Malibu's Chief Operating Officer Ritchie Anderson, who explained that Malibu started to consider safety labels for bow swamping after, and as a direct result of, *Bell v. Mastercraft*. V6-1846, 1858-61. He agreed that Malibu decided to add warning labels on new boats, but chose not to send labels to owners of existing boats. V6-1866. Mr. Anderson also admitted that water came over the bow during the informal testing that he was involved with, and testified that he personally experienced water come over the bow when operating a Malibu boat. V6-1881-82, 87. To close the sixth day, Plaintiffs played the video deposition of Dennis Ficarra,

Meg Batchelder's uncle, and the driver of the boat at the time of the incident. V6-1899-1946.

The **seventh** day of trial began by completing Mr. Ficarra's video deposition, V7-1987-2035, before Plaintiffs played the video deposition of Malibu's VP of Product Sales, Adam McCall. V7-2037. Mr. McCall testified that water frequently came over the bow of Malibu boats in his experience, that bow dipping was a common phrase he was familiar with, and that he had no idea how much weight was safe to put in the bow of a Response LX. V7-2038-41. Next, Plaintiffs called Darin Batchelder as an eyewitness to the incident and a damages witness. V7-2049-2123. Darin explained that after the bow swamped it looked like the whole lake had filled up the front of the boat and he thought it was going to the bottom of the lake. V7-2078. He was grateful that Mr. Ficarra was driving and thought that Mr. Ficarra's split-second decision to briefly put the boat in reverse kept them from going to the bottom of the lake. V7-2079; 2082.

Plaintiffs next played the video deposition of Malibu's VP of Product Design Dan Gasper. V7-2133. Mr. Gasper explained that he had worked at the company for 31 years and was in charge of the design of the Response LX (among other boats), but that his only formal education was a high school degree. Mr. Gasper admitted that he had no engineering training or background. V7-2133-37. In fact, when Malibu hired Mr. Gasper, he was working at his family's dairy farm. V7-2143. He testified that no professional engineer was ever involved in the design of the Response LX, and he did not even attempt to calculate the boat's center of gravity, center of flotation, or center of buoyancy. V7-2138. In fact, despite being in charge of certain boat designs at Malibu, including the Response LX, Mr. Gasper admitted that he did not know how to calculate the safe bow weight capacity for a boat. V7-2168.

Mr. Gasper confirmed that the Response LX was the same design from 1999 until 2015. V7-2142. He admitted that during his informal testing of Malibu boats he experienced water coming over the bow and was concerned about low freeboard. V7-2161. Mr. Gasper conceded that water intrusion into the boat, which can happen as a result of low freeboard, is a boating hazard. V7-2290.

Mr. Gasper acknowledged that he had been warned by Malibu's Australian distributor that there was a problem with water coming over the bow of the Response LXi around 2003 or 2005. V7-2158; 2215-17. Mr. Gasper admitted that he personally developed a concern for water coming over the bow of the LXi because he noticed the nose of the bow getting close to the water when he slowed the boat down or stopped it in the water during his testing of it. V7-2160-2161. He even took water over the bow during that testing. V7-2161. In fact, Mr. Gasper testified that the LXi got closer to the water than any other boat he had ever been in. *Id.*

Because of these things, in 2003 Malibu implemented a bow capacity warning label on its LXi model boats, but not on any other models. Malibu did so because water coming over the bow is a safety issue/concern. V7-2158-2159; 2163. Despite the LXi being a "different boat" from the Response LX, Mr. Gasper described the differences as the LXi having a "slightly lower profile," that resulted in a lower freeboard, and which caused the boat to take on water when the bow seating area is loaded. V7-2158-2159. But other evidence showed that the Response and Response LX actually had a lower freeboard than the LXi. Exh. 138 (Showing Response (which is identical to the Response LX other than the lack of bow seating) having a lower bow freeboard than the LXi). Despite Mr. Gasper's claim of a lower profile, he admitted that there were only "little minor differences" between the performance of the Response LX on the water, and the Response LXi, and

that there were no performance differences between the Response LX and the Echelon. V7-2176. He further admitted that there was "no reason for there to be" any difference in the center of gravity, center of flotation, or center of buoyancy between any Malibu Response or Echelon model boats, including both the Response LX and the Response LXi. V7-2140-2141. That is because, as between those boats, the windshield (and thus the helm) is in the same location, the engine is in the same location, they have the same amount of parts, and they have very similar overall weights. V7-2141.

Mr. Gasper explained that the later decision to add warning labels to the bow of the Response LX was safety-related because of this hazard. V7-2163-67. He also testified that Malibu had, on numerous other occasions, warned existing customers of later discovered defects, including a carbon monoxide warning campaign that started in 2005, V7-2178 (Malibu West), a throttle/shifter issue in 2008, *id*. (Malibu LLC), and an issue with a lack of floatation in the boat. V7-2191. In fact, Mr. Gasper "recognized that if a safety issue comes up after [a] boat [is] sold that it was Malibu's responsibility to warn the people about that safety issue that [are] using the boats." V7-2192. He further admitted that "it [is] Malibu's responsibility that if [Mr. Gasper is] aware of a safety issue that [he and/or Malibu] should convey that safety issue to the users of the boat," "including parents whose children would use the boat." V7-2190-2191.

Mr. Gasper also confirmed that the Malibu executive leadership meetings in 2011 and 2012 considered warning about the bow-swamping hazard for boats that had already been sold to Malibu customers (like Malibu had chosen to do for new boats) but never did. V7-2183-84. Moreover, he admitted that he has experienced water coming over the bow of a Malibu boat over **50 times**. V7-2196. But he explained that Malibu did not like to put a lot of warnings on its boats because of the way it looked, and because of the costs

associated with labels. V7-2210 ("Aesthetic, cost, handling. Like, it's all cost, I guess, you know.").

Mr. Gasper also admitted that he had known since the Response LX was designed for its first release in 1996 that having too much weight in the bow could cause "water influx" that could result in "injury or death." V7-2212. Mr. Gasper then explained Malibu's implementation of warning labels in the bow after *Bell v. Mastercraft*. V7-2221. He admitted that the warning was equally applicable to the 2000 Response LX, though Malibu never warned customers about that. V7-2222. He also testified that it was reasonable for customers to expect that Malibu would warn them about a danger in the boat even after it had been sold. V7-2227.

After Mr. Gasper's video deposition was completed, Plaintiffs called family friend Debbie Crombie as a damages witness, V7-2230-36, before playing the video deposition of Scott Ward, a Malibu Product Engineer who was first hired in 2014 and is in charge of product testing. V7-2237-2239. Mr. Ward explained his understanding that, if water even touches the vinyl of the bow seat, Malibu considers that a "fail" of the bow dip test. V7-2241; 2244-2245. Mr. Ward testified that "the reason we do [the bow dip test] is . . . another boat manufacturer [had] a lawsuit against that test. And we did it we [sic] do it to protect Malibu and to protect the people that use the Malibu boat." V7-2252 (referring to *Bell v. MasterCraft*). He also agreed that "sinking or swamping deserves the highest level of warning," V7-2262, and that if an occupant is ejected from the bow there is "a much higher likelihood of intersecting with the path of the boat's propeller." V7-2264.

The next Malibu employee to have his video deposition played was Matthew Slayden, a Project Manager for Malibu. V7-2275-2276. He explained that he created the bow dip test, it was a safety test, and it did not exist before he joined the company in 2009.

V7-2278; 2276. Like other Malibu employees, he explained that Malibu decided to put warning labels on the bow because of the risk of injury and death, but that decision was prompted by *Bell v. Mastercraft*. V7-2285. Mr. Slayden also agreed that it would be reasonable for a purchaser to expect that Malibu would warn of a danger it learned after the sale of the boat. V7-2287. He admitted that "the same hazard that Malibu was trying to prevent when it decided to put the bow limit warning labels in the boats in 2011 ... **that same issue, that same concern existed back in 2000.**" V7-2287 (emphasis added). After that, Meg Batchelder testified about her son Ryan, and what she witnessed the day of this death. V7-2292 – 2327.

The Plaintiffs began the **eighth** day of trial by playing the video deposition of Paul Gaines, who was in Research & Development for Malibu. V8-2350-2351. He admitted that he has seen water come over the bow of the Response LX approximately three times during testing when it was traveling about 5mph, but he contended that only happened when the bow dip test was "performed incorrectly." V8-2357-60. He agreed that any time you have water come over into the boat that it is not safe. V8-2369. He also conceded that he remembered Malibu's Australian distributor recommending a warning back in 2005. V8-2379. Mr. Gaines testified that he did not know what a safe amount of weight was to put in the bow of the Response LX and conceded that when warning labels were finally put in place it was to protect Malibu from liability, indicating customer safety was an afterthought. V8-2382-23, 2386. He did not recollect ever warning customers in the field about the bow swamping risk posed by their boats that were purchased before Malibu was applying bow warnings. V8-2387. Finally, he admitted that Malibu should have warned about any hazard that it knew about. V8-2393-94.

Next, the Plaintiffs played the video deposition of Malibu's current Chief Executive Officer, Jack Springer. V8-2400. Mr. Springer told the jury that Malibu has made not changes and did not plan to make any changes as a result of this case or Ryan's death. V8-2411:11-23 He explained that Malibu did have a process to warn boat owners in the field about a hazard Malibu learned about after selling a boat. V8-2421. He conceded that if Malibu is aware of a safety issue, that it would, to the best of its ability, warn owners in the field about the safety condition, even the boats were sold years ago. *Id.*; V8-2425 ("If we are aware of a safety hazard, then we would make efforts to warn people about it.").

Like other Malibu employees, Mr. Springer testified that Malibu's decision to add bow warning labels to the Response LX in 2011 was a direct result of *Bell v. Mastercraft*, and the industry strategy meetings that developed as a result of the case. V8-2426-33. He admitted that he was aware of the *Bell v. MasterCraft* case while the case was ongoing; he did not become aware of it only as a result of the verdict. V8-2427. In fact, he first became aware of the case "a couple months after [he] came onboard [at Malibu] in 2009," long before the June 7, 2011 verdict. V8-2428. In discussing the changes that Malibu made to convert the Response to the Response LX, Mr. Springer admitted that, were he CEO at the time, it would cause him concern that Malibu was putting occupants in the bow of a boat that was not designed to carry occupants in the bow, and that these changes resulted in an engineering concern that too much weight was being put too far forward. V8-2444-2445. He also conceded that Malibu has not performed analysis of accidents or injuries that have occurred in any Malibu boats. V8-2448.

After Mr. Springer's deposition finished playing, counsel for the Plaintiffs read a portion of the deposition of Malibu's Chief Financial Officer, Wayne Wilson, to the jury. V8-2477. When asked whether he worked for Malibu LLC or Malibu Inc., Mr. Wilson said

"it didn't matter." V8-2477. He explained that Malibu LLC owned a number of ski boat brands including Axis, Cobia, Pathfinder, Hughes, Maverick, Pursuit, Cobalt, and Malibu Australia. V8-2482-84. And he testified that Malibu Boats, LLC is the operating entity of Malibu. V8-2482. Mr. Wilson also explained that when Malibu transitioned from the West entity to LLC it kept "for all intents and purposes, you know, it would have been **all** the material assets." V8-2487 (emphasis added). According to Mr. Wilson, LLC also took some liabilities from West, which he described as "operating money liabilities" that included accounts payable and **warranty obligations** for boats that were manufactured and sold by West. V8-2488 (emphasis added). He also explained that the owners of West continued to be owners of LLC; specifically, for example, Bob Alkema "retained" an ownership interest in Malibu under Malibu LLC. V8-2487.

Finally, Plaintiffs played the video deposition of Malibu VP of Engineering Cory Dugger. V8-2492. He admitted that Malibu started placing bow capacity warning labels on the Response LX by 2012. V8-2494. Specifically, it did so after doing the bow dip test was done at 5-7mph, which is about the speed the boat was traveling in the subject incident. V8-2495-99. Like other Malibu employees, he explained Malibu implemented the bow dip testing because of *Bell v. Mastercraft*. V8-2502. Mr. Dugger admitted that bow capacity warning labels cost Malibu a mere $0.62 per boat. V8-2504.

After Mr. Dugger, Plaintiffs' final witness, Plaintiffs then moved into evidence the exhibits that had been referenced in the portions of all of the video depositions that were played for the jury, and they were admitted as Plaintiffs' Exhibit Nos. 69 (Slayden's Deposition Exhibits); 70 (Ward's Deposition Exhibits); 78 (Alkema's Deposition Exhibits); 79 (Gaines' Deposition Exhibits); 83 (Anderson's Deposition Exhibits); 84A (Macklemore's Deposition Exhibits); 85 (Springer's Deposition Exhibits); and 91

(Gasper's Deposition Exhibits).[10] Subject to finalizing these exhibits, the Plaintiffs rested and Malibu began its case.

First, Malibu played the video deposition of Zack Batchelder, Ryan's cousin who witnessed the incident. V8-2517-33. Next, Malibu called Barney Mayfield, the owner of Anchorage Marina, which was the boat rental facility that rented the Response LX to the Batchelders. V8-2535. Shortly after Mr. Mayfield took the stand, Malibu's lead trial counsel posed a question that directly elicited a response from his witness mentioning a boat safety video put out by the Georgia Department of Natural Resources, which the Court had long-ago excluded as irrelevant and unfairly prejudicial. V8-2538. The Court cautioned Malibu again to ensure that it did not violate any more orders on motions *in limine*. V8-2547. When testimony resumed, Mr. Mayfield testified that he would have put a warning on the bow of the Subject Boat rented to the Batchelders if Malibu would have sent it to him. V8-2574.

Next, despite his already testifying by video deposition, Malibu called its VP of Product Design, Dan Gasper, as a witness, but this time Mr. Gasper appeared live before the jury. V8-2577. Mr. Gasper testified that he had worked continuously for Malibu through the various entity change from 1988 until the day of trial. V8-2618.

In discussing various Malibu boat designs, Mr. Gasper testified that Malibu's Response and Echelon models used an identical hull, Malibu's SV23 hull. V8-2584-2591. As a result, these boats were all similar in size, width, and height. V8-2592. Mr. Gasper explained that Malibu intended to create low-profile boats with low freeboard because

---

[10]  The Defendants objected to the admissibility of the deposition exhibits, but did so only on the basis of foundation. V8-2509. The Court overruled that objection for three independent reasons: (1) it was waived as untimely because it was made long after deposition designation objections were due, (2) Malibu stipulated to the authenticity of the documents that they produced, and (3) the foundation had been laid in the deposition testimony that Malibu agreed to have played to the jury.V8-2512, 2515.

"for a tournament ski boat, you want the boat to be as light as you can get it " V8-2592. Among these boats, Mr. Gasper described the Response LXi as an "entirely new" and "entirely different" boat that was built on the same technology as the previous Response iterations. V8-2597. To that end, he explained that the LXi was longer and wider than the LX, but the height and deck were very similar, and it was "very similar in [Malibu's] design and technology." V8-2597-2598. Most notably, the LXi had a walk-though bow, as opposed to an isolated bow seating area. *Id*. Despite these differences, the freeboard profile of the LXi was "very close" to that of the LX. V8-2598. In fact, Mr. Gasper again admitted that he remembers the bow of the LXi getting so close to the water that he was nervous and wondered whether it would be a problem. *Id*.

When Mr. Gasper's informal testing revealed that water came over the bow of the LXi "sooner than the previous models," Malibu did not change the design, rather, it opted to put a bow capacity warning on the boat before Malibu began selling it to the public. V8-2598-2599. Malibu opted not to put a similar warning on other boats in the Response family because "they didn't exhibit that problem. We didn't think it was a problem there." V8-2599. When asked how Malibu determined in testing whether a boat is "no good," Mr. Gasper admitted that Malibu does not have a criteria that he is aware of." V8-2612-2613.

When discussing the various Malibu entities, Mr. Gasper explained that he owned a portion of Malibu West, and that ownership transferred directly over to Malibu LLC when it was formed. V8-2619. He further testified that after the change from West to LLC everything was still the same. *Id*. He went to work in the same place. *Id*. He did the same job. *Id*. Malibu made the same boats. *Id*. And made them at the same plant. *Id*. The only thing different after the company was sold was that it was "called something different." *Id*. Mr. Gasper also explained that after the IPO in 2014, he was still an owner, doing the

same job, making the same boats, in the same plants. V8-2620. In fact, Mr. Gasper admitted that the only thing that changed when Malibu changed from West to LLC to Inc. was the name. ("**Q:** [R]eally, all that changed was the name of the company, right? A. Yeah, I guess so.") *Id.* Mr. Gasper went on to explain that the same was true for Malibu's former CEO Mr. Alkema. He kept the same job and remained an owner during the transition from West to LLC. V8-2621.

Mr. Gasper further admitted that he knew as far back as 2005 that the Response LXi had problems with water coming over the bow, and that it needed a warning. V8-2630-31. He then conceded that he did not know whether the LXi or the subject LX model had a lower freeboard. V8-2627; 2630. And he admitted that, once be became aware of the swamping issue with the LXi, neither he nor Malibu looked at Malibu's other boats to determine whether their freeboard was lower than that of the problematic LXi. V8-2628.

Mr. Gasper was then confronted with a Malibu document, Plaintiffs' Exhibit 138, which showed that the Response and Response LX had a bow freeboard that was 4.75 inches **lower** than that of the problematic Response LXi; the boat that Malibu determined had a safety hazard for swamping that was serious enough to warrant an on-product warning. V8-2630-35; Pl. Exh. 138. To that, Mr. Gasper had no response but to disagree with what was obviously an internal Malibu corporate document containing measurements performed by Malibu itself. *Id.* But even then, he admitted that the bow freeboard on the Response LX and Response LXi are "[v]ery similar in height." V8-2635-2636. And Mr. Gasper conceded again that, once Malibu decided to implement a bow warning on the LXi, it "probably" should have sent that same warning to people who had already purchased the LXi. V8-2624.

When discussing whether it is important to have engineers involved in the design of a boat that Malibu sells to families, Mr. Gasper explained that he guesses that you could call boat design considerations "engineering principles," but that he, as a high school graduate, has "never met [any engineer] who could really tell [him] anything [that he] didn't know or [one who could] teach [him] anything." V8-2653.

Toward the end of the eighth day, Malibu called its expert Kevin Breen to defend the design of the Malibu Response LX. V8-2672. That evening the Court began working on the jury charge with the parties and assembled most of the charge, reserving some issues for later discussion. V8-2729-92.

On the **ninth** day of trial, Mr. Breen continued testifying. V9-2805. Malibu yet again violated this Court's order on a motion *in limine* by beginning to offer testimony of a purported "recreation" of the event. V9-2813-14. After the Court reminded Malibu that it could talk about the testing but not suggest it was a "recreation," Mr. Breen continued his testimony offering his opinions that there was no design problem or hazard in the Response LX. V9-2857-2866. Next Malibu called its warning expert, Dr. Stephen Arndt, V9-2878-2924, and boating safety expert Dr. Wendy Sanders, V9-2950-3035, to offer their opinions that no warning label was necessary for the Response LX and that the subject incident was the result of operator error.

Malibu next called its Chief Financial Officer Wayne Wilson to testify live before the jury. V9-3046. Before he began though, the parties discussed, and the Court reemphasized, the Court's ruling that Malibu could not contradict the stipulation that each of the three Malibu entities were a manufacturer of the Subject Boat for the purposes of this case. Malibu could, however, explain which entity was in control at certain points in time for purposes of apportionment among the Malibu entities. V9-3042-3045.

Mr. Wilson testified that the owners of the Malibu West entities—Bob Alkema and his employee and former employee shareholders—became owners of Malibu LLC through a holding company. V8-3062. He also explained that Bob Alkema was in control of West and remained a director when LLC became the operative entity. V9-3064-3065. Mr. Wilson also admitted that the company that made the decision to not warn about Response LXs already in the field was **Malibu LLC**. V9-3076:11-12. After some resistance, Mr. Wilson admitted that if Malibu LLC had learned of a safety defect in the 2000 Response LX after it was sold in 2011 and 2012, that Malibu would have warned previous Response LX purchasers about it. V9-3080 (referring generally to boats that were sold before Malibu LLC was created: "if we thought that there was a safety defect in the boat, it's likely we would have warned people"); V9-3081 ("If there is a safety hazard, we feel that it's appropriate – you can say that means you're responsible to warn."). Mr. Wilson also conceded that after the transition from West to LLC Malibu's "facilities and the molds [to make boats] and employees are the same or substantially the same." V9-3082-3083.

Under cross-examination, Mr. Wilson admitted that Malibu's counsel had provided him with reports about the trial containing testimony that had been given by the witnesses. The Court was concerned about the violation of its Order that the witnesses be sequestered from one another; a rule that Malibu itself invoked. V9-3084-3088. While Malibu had identified Debbie Kent as its corporate representative, and while Ms. Kent was present as Malibu's representative from the beginning of trial, Malibu then claimed (for the first time) that Mr. Wilson was, in fact, also its corporate representative. Malibu then argued for the first time that it was entitled to two corporate representatives. V9-3088. When questioned about their position on the matter, Malibu's counsel insisted that

they had only these two corporate representatives for trial, and that no other officers of Malibu had been given information about the testimony offered at trial. V9-3094.

Malibu then notified the Court that it intended to call its current CEO Jack Springer to testify as their last witness. At that point, Plaintiffs' counsel inquired whether Mr. Springer had also received mid-trial reporting on the testimony of other witnesses that would violate the rule of sequestration. Counsel for Malibu insisted that Mr. Springer had not received or reviewed any such reports. V9-3095. When the Court proposed talking to Mr. Wilson about whether he had discussed testimony mid-trial with Mr. Springer, Malibu voluntarily withdrew Mr. Springer as a witness to moot any concerns that Malibu or its witnesses had violated the Rule of Sequestration. V9-3100-3103. After the issue with sequestration was resolved, Malibu briefly redirected Mr. Wilson and then the defense rested. V9-3117.

The parties gave their closing arguments on the **tenth** day of trial, Friday, August 27, 2021, V10-3235-3407, the jury received the charge, V10-3410, and then the jury began deliberations. The jury returned its compensatory verdict the next day, Saturday August 28, checking "yes" that Plaintiffs were entitled to punitive damages against Malibu West and Malibu LLC (but not Malibu Inc.), and finding via special interrogatory that Malibu LLC was the legal successor of Malibu West. V11-3446-3450. The parties then gave arguments and presented evidence to the jury about punitive damages, and the amounts that should or should not be awarded against Malibu West and Malibu LLC. V11-3460-3486.

### D. The Verdict, Judgment, and Post-trial Proceedings

Because of the age of the boat, prevailing on a *design defect* claim meant that the Plaintiffs had to prove the applicability of an exception to the statute of repose.

Accordingly, for purposes of their *negligent design* claim, Plaintiffs had to prove that the defect arose out of "conduct which manifests a willful, reckless, or wanton disregard for life or property." O.C.G.A. § 51-1-11(c). To simplify matters, the parties consented to a line on the verdict form that consolidated that exception with the question of negligent design, and as so phrased, the jury found against the Plaintiffs on that claim:

1.    Did any of the following Defendants act with a reckless or wanton disregard for life or property in the design of the 2000 Malibu Response LX, and was that conduct a proximate cause of the death of Ryan Batchelder?

    a.  Malibu Boats West, Inc.    ___NO___ (YES or NO)

    b.  Malibu Boats, LLC       ___NO___ (YES or NO)

    c.  Malibu Boats, Inc.      ___NO___ (YES or NO)

Verdict Form, p. 1, filed August 28, 2021. That finding by the jury meant, at least (and at most), that the jury did not believe that Malibu had been *reckless* when it originally designed the boat *in 1996 or 1999*. But the jury did not find Malibu blameless, as the answer to the next question showed.

Plaintiffs also alleged a failure to warn claim premised on the notion that Malibu knew or should have known of a swamping hazard posed by the 2000 Response LX, but continuously failed—all the way up to the day of the incident in July 2014—to warn of that hazard. The jury found in favor of the Plaintiffs on that claim, and against Malibu Boats West, Inc., and Malibu Boats, LLC (while holding that Malibu Boats, Inc. was not liable):

2.    Did any of the following Defendants negligently fail to warn of a hazard posed by the 2000 Malibu Response LX, and was that conduct a proximate cause of the death of Ryan Batchelder?

a.    Malibu Boats West, Inc.    ___yes___    (YES or NO)

b.    Malibu Boats, LLC    ___yes___    (YES or NO)

c.    Malibu Boats, Inc.    ___no___    (YES or NO)

Verdict Form, p. 1, filed August 28, 2021. That finding was consistent with the evidence. Indeed, it is consistent with a finding that Malibu negligently (just not recklessly) designed the boat in the 1990s and knew then—and subsequently knew more clearly—that the boat possessed a safety hazard that could result in serious injury or death, but failed to warn, or even attempt to warn, of that hazard despite having the ability to do so, and the knowledge and understanding that it should do so.

As outlined above, the evidence was powerful that Malibu knew of water coming over the bow and of swamping in the Response LX and its substantially similar sister model, the Response LXi. In 2005, the Malibu West regime learned of numerous swamping incidents with the Response LXi, but chose at that time not to warn on boats in the United States (a decision that, at least according to Mr. Gasper, Malibu later changed course on).[11]

And again in 2011 and 2012, Malibu LLC made conscious decisions to not warn customers and users about the known safety hazard of bow swamping with previously sold Response LXs, despite deciding to warn of the hazard on identical Response LXs sold from 2012 forward. Because of that, and likely because of the testimony of Malibu's

---

[11] As noted in the testimony above, Malibu's internal documents demonstrate that the Response LX had an even lower freeboard than the LXi that Malibu recognized as containing a safety hazard for bow swamping; one that Malibu determined was serious enough to warrant an on-product warning.

employees and executives during trial, and the positions that those witnesses staked out on issues that were central to the case, the jury found that Plaintiffs were entitled to recover punitive damages from both West and LLC:



### Punitive Damages

**If you find in favor of Plaintiffs, please answer the following:**

Plaintiffs are entitled by law to recover punitive damages against Malibu Boats West, Inc.

__✓__ (YES)            _____ (NO)

Plaintiffs are entitled by law to recover punitive damages against Malibu Boats, LLC.

__✓__ (YES)            _____ (NO)

Plaintiffs are entitled by law to recover punitive damages against Malibu Boats, Inc.

_____ (YES)            __✓__ (NO)

Verdict Form, p. 2, filed August 28, 2021. Ultimately, the jury apportioned fault as follows: 10% to Malibu West, 15% to Malibu LLC, and 75% to Dennis Ficarra. The jury awarded $5,000,000 for the life of Ryan Batchelder, and $75,000,000 for the pain and suffering he endured from the moment the swamping incident began to his untimely death at some point thereafter.[12] In the punitive phase, the jury awarded $40,000,000 in

---

[12] Malibu has not argued that any of the jury's compensatory awards were excessive, and it has not asked for a remittitur on either the wrongful death claim or the pain and suffering claim. Malibu has likewise not requested a remittitur on any of these jury awards. Given that Malibu has not developed any claim of error with respect to the amounts of the jury's compensatory awards, Malibu has abandoned any such claims in its supplemental briefing. *See Hartsfield v. Hartsfield*, 87 Ga. App. 707 (1953) (inadequately developed argument for new trial is waived); *Craig v. State*, 105 Ga. App. 244 (1962) (same). To the extent that the Court is called upon as a thirteenth juror, the Court agrees that the compensatory awards are not excessive. Perhaps even worse than burning to death, Ryan, a seven-year-old boy, was chopped up, had his leg amputated, was disemboweled and—according to medical examiner testimony—likely lived for 1-3 minutes after enduring that trauma, during which time he bled to death and drowned, helpless, wrapped around the propeller, with his brother, cousins, and uncles screaming for him above. Additionally, the calm, reasoned decision-making of the jury was shown by its decision to allocate substantial fault to the driver. The award of pain and suffering damages was, simply, appropriate and not excessive given the grievous, traumatizing death that Ryan suffered.

punitive damages against Malibu West, Inc., and $80,000,000 in punitive damages against Malibu Boats, LLC.

The Court thereafter entered judgment on the verdict. Because the jury made a factual finding that LLC was a mere successor of West and responsible for its liabilities, the judgment against West was entered jointly against it and LLC. *See* Verdict Form, p. 2, filed August 28, 2021. The judgment against LLC was entered against only LLC. *See* Judgment, p. 2, filed August 28, 2021. The Court heard a motion to amend the judgment to include attorneys' fees and expenses under O.C.G.A. § 9-11-68 and to include pre-judgment interest under O.C.G.A. § 51-12-14. The Court elected to defer the issue of attorneys' fees and expenses and declined to award prejudgment interest under currently controlling decisions of the Court of Appeals, which do not count punitive damages toward the total award for purposes of prejudgment interest.

As it pertains to the present posture of this case, Malibu West never challenged the verdict or judgment, but Malibu LLC filed a motion for judgment notwithstanding the verdict or in the alternative for new trial on September 7, 2021. The motion enumerated 28 separate errors, but did not develop any of those claimed errors until Malibu filed a more targeted supplemental brief in support of that motion on May 24, 2022 – just under 35 hours before the hearing that the Court set for post-trial motions months beforehand. The Court heard argument on Malibu's motions on May 26, 2022, and now issues this Order.

## III.    **ANALYSIS AND RULINGS**

Malibu raises a number of challenges to the jury's verdict and this Court's rulings. Each is addressed in turn.

## A. Standard for JNOV

The standard for granting a judgment notwithstanding the verdict is the same as a motion for directed verdict:

> Where there is no conflict in the evidence as to any material issue, and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed. In reviewing grant of a directed verdict or a judgment notwithstanding the verdict, we must decide whether all the evidence demanded it, or whether there was some evidence supporting the verdict of the jury. A judgment notwithstanding the verdict is improperly granted in the face of conflicting evidence, a [reviewing] court must view the evidence in the light most favorable to the party who secured the jury verdict.

*Pendley v. Pendley*, 251 Ga. 30, 30-31 (1983). The grant of a motion for judgment notwithstanding the verdict "is authorized only when the evidence and all reasonable deductions therefrom demand a verdict in favor of the movant." *Mercer v. Woodard*, 166 Ga. App. 119, 127 (1983). The granting of such a motion "is a very, very grave matter...[and] declares that there is no conflict in the evidence, and that all deductions and inferences from the evidence introduced demand a particular verdict." *Johnson v. Curenton*, 127 Ga. App. 687, 688 (1972) (internal quotations omitted).

A "directed verdict **cannot** be granted if there is **any** evidence" supporting the jury's verdict. *Miller v. Lynch*, 351 Ga. App. 361, 366 (2019) (emphasis added; reversing grant of directed verdict). Further, "opinion evidence, circumstantial evidence, presumptions of fact, or evidence subject to more than one reasonable construction ... [may provide] the 'any evidence' creating a jury question." *Id.* at 364. In other words, a "motion for directed verdict should not be granted where there exists **even slight** material issues of fact, because the trial court is substituting its judgment for the jury's." *Id.* For that reason, this Court is obliged to "view the evidence in a light most favorable to the jury's verdict." *Vojnovic v. Brants*, 272 Ga. App. 475, 475 (2005).

## B. There is Sufficient Evidence to Support the Verdict Against Malibu Boats West, Inc.

Malibu West has not filed any post-trial motions. Malibu LLC has challenged the verdict against West, but only to the extent that LLC is jointly liable for it. Malibu's challenge here is, essentially, that West neither knew nor should have known of the hazard and thus did not breach any duty by failing to warn of it. Although JNOV is a legal concept, the formulation of Malibu's argument makes it simply one of whether there was any evidence to support the jury's finding that it did know of a swamping hazard by the Response LX and failed to warn. As outlined above, there was overwhelming evidence to that effect.

Malibu argues that a manufacturer's knowledge of a safety hazard must be shown by proving the existence of another similar incident that would have put the manufacturer on notice that it should warn users or consumers of the danger. Malibu cites no case to support this proposition, and it appears that there is none. A manufacturer's "duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product." *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1994). In fact, "a duty to warn can arise even if a product is not defective." *See, e.g., Hunter v. Werner Co.*, 258 Ga. App. 379, 384 (2002). Although OSIs may be one method of showing that a manufacturer had the requisite knowledge of the hazard, other methods also suffice. An OSI is by no means required for a plaintiff to prove the manufacturer's knowledge. Here, for example, other evidence, which is compelling, demonstrates that Malibu had direct knowledge of a safety hazard for bow swamping or, at the very least it should have known about that hazard. The motion for JNOV on this Ground is denied.

### C. There is Sufficient Evidence to Support the Verdict Against Malibu Boats, LLC

Next, Malibu LLC argues that (1) it owed no duty to Ryan Batchelder; (2) even if it did, it did not breach any such duty because it did not know of any swamping hazard posed by the Response LX; and (3) even if it did breach a duty to warn, that breach did not proximately cause the incident. Each argument fails for separate but related reasons.

### 1. Malibu Boats, LLC, Owed a Duty to Warn of Hazards Posed by the 2000 Response LX that it Knew or Should Have Known About

The Court finds there was sufficient evidence for the jury to find that Malibu LLC owed a duty to warn of hazards posed by the 2000 Response LX for at least five different reasons.

**First**, Malibu LLC stipulated that it designed, manufactured, and sold the Subject Boat for the purposes of applying Georgia product liability law to this case, so Malibu LLC therefore owed the same duties owed by entities with those designations. *See* Pretrial Order, ¶ 14a and b, filed August 16, 2021. *See Walker v. Sutton*, 222 Ga. App. 638, 641 (1996) (reversing a trial court for letting a defendant out of a stipulation that it owned the vehicle that struck the plaintiff even though there was evidence that he had sold it). A stipulation "is not only binding as a part of the pretrial order, but so long as it is before the court is binding because it is a stipulation by the parties upon which a resolution of the issue was to be made, and was binding even though it might in some manner contradict or conflict with the pleadings." *Goolsby v. Allstate Ins. Co.*, 130 Ga. App. 881, 883 (1974); *Long v. Marion*, 257 Ga. 431, 431 (1987) ("A pretrial order limits the issues for trial to those not disposed of by admissions or agreements of counsel."). That is, simply the end of it. The principles of estoppel (Plaintiffs relied on five and a half years of Malibu's litigation conduct in addition to the stipulations), admissions (there were

multiple made by its lead trial counsel and employees), and the lack of any manifest injustice all properly leave Malibu bound by the stipulation that it manufactured the Subject Boat.[13] And to reiterate, the documents and testimony clearly demonstrate that Malibu's trial and appellate counsel—all of whom were included in the various e-mails at issue—voluntarily, willingly, and deliberately entered into the stipulations after considering all of the options available to Malibu. This is especially true given Malibu's similar admissions throughout the case. *See* pp. 51-52, *infra.*

Indeed, the Court of Appeals noted in *Walker* that even if the defendant were let out of its stipulations and admissions, that would just mean they were not *binding* – they would still be admissible evidence that it was the manufacturer that would support the jury's verdict. *Walker v. Sutton*, 222 Ga. App. at 641 ("Even if Sutton had been entitled to withdraw his admissions and amend his answer and the pretrial order, in so doing, jury questions would have been created. Admissions formally withdrawn from the pleadings are no longer solemn admissions in judicio; **nevertheless, a jury may accord them credence and effect upon the trial of a case.**" (emphasis added)). The stipulation clearly reflects the parties' intent to take the question of whether Malibu LLC was a manufacturer of the boat away from the jury and stipulate that it was.[14]

**Second**, Malibu LLC admitted in judicio, on multiple occasions throughout this litigation, that it was a manufacturer of the Subject Boat, presumably for the purposes of

---

[13]  Malibu also argues that the stipulation was ambiguous, but it is not. The stipulation was clear that all the Malibu entities were manufacturers of the subject 2000 Response LX for purposes of this product liability case.

[14]  Malibu also argues that the parties did not treat the stipulation as binding, but that is contrary to the record. Plaintiffs carefully ensured it was treated as binding, they objected when Malibu's counsel attempted to contradict it, and the Court enforced it. V9-3042-45 (Plaintiffs' counsel reminding Malibu about stipulation before Wilson testimony); V10-3357 (objecting to Malibu trying to argue it was not a manufacturer). And contrary to Malibu's argument, the details of corporate succession were not contrary to the stipulation; rather, they were admitted to show which entity was responsible to warn at any given time. *See* V9-3076:11-12 (Mr. Wilson testifying that the decision to not warn in 2011 and 2012 was Malibu LLC's decision).

applying Georgia product liability law to this case. *See* Case No. A18A0881, Brief of Appellant Malibu Boats, LLC, at pp 1, 4, 7 (*e.g.*, "The boat was . . . manufactured by Malibu Boats ("Appellant" or "Malibu") [referring to the Appellant "Malibu Boats, LLC f/k/a Malibu Boats, Inc."]); *see also id.*, Application for Interlocutory Appeal (same). In fact, Malibu plainly admitted in a pleading file with this Court that the Malibu Defendants collectively designed and manufactured this boat, which is virtually identical to the stipulation that Malibu entered into, and then later claimed that it did so mistakenly:

> In the summer of 2014, non-party Dennis Ficarra and plaintiff Darin Batchelder took four children—Ryan, Josh, Zack, and Kayla Batchelder—out in a **Response LX Bowrider designed and manufactured by Malibu Defendants (the "Subject Boat")** that Darin and Stephan Batchelder rented from defendant Anchorage Marine, Inc.

Defendants Malibu Boats, LLC, f/k/a Malibu Boats, Inc.; Malibu Boats West, Inc.'s Motion for Attorneys' Fees and Costs, filed June 30, 2020 at 3:55 p.m. (explicitly defining the "Malibu Defendants" as all of the collective defendants: "Malibu Boats, LLC, f/k/a Malibu Boats Inc., and Malibu Boats West, Inc.") (emphasis added). Malibu's admissions on this particular issue continued throughout the litigation, and all the way into the Pretrial Order itself. Separate and apart from the party stipulations that Malibu argues it mistakenly entered into, Malibu admitted in the Pretrial Order that "**Malibu Defendants manufactured the subject Malibu Response LX and sold it to a dealer in 2000.**" Pretrial Order, filed in open Court by Judge Caudell on August 16, 2021 at 8:42 a.m., § 9 at "Defendants' brief and succinct outline of the case and contentions" (referring again, and collectively, to "Malibu Boats, LLC, f/k/a Malibu Boats Inc., and Malibu Boats West, Inc.") (emphasis added). Importantly, while the parties collectively had a hand in drafting the now-disputed stipulations, this portion of the

Pretrial Order was drafted solely by Malibu and was signed off on by all of Malibu's counsel.[15]

Malibu's admissions in judicio on this issue were not confined to its pleadings. In fact, Malibu's lead trial counsel, in his opening statement to the jury at trial, represented that Defendants were "different companies," but the jury was going to "hear Malibu West, and Malibu, LLC, and Malibu, Inc., **because they're the same company**." V3-690. (emphasis added)[16]

These statements are yet more evidence that Malibu consciously and intentionally entered into the stipulation about the status of Malibu LLC. The Court further finds them to be conclusive and dispositive of the question against Malibu LLC, recognizing that no Defendant has moved to withdraw any of these admissions.

**Third**, Malibu LLC assumed the duty to warn. Its employees testified that Malibu LLC continued to warn about safety issues involving older boats that were sold by Malibu

---

[15] It is well-settled that, once entered, a Pretrial Order limits the issues for trial to those not disposed of by admissions and agreement of counsel, and controls the subsequent course of the action, unless modified at trial to prevent manifest injustice. *See* O.C.G.A. § 9-11-16(b); *see also Moses v. Pennebaker*, 312 Ga. App. 623, 625 n.5 (2011) (citing *Gaul v. Kennedy*, 246 Ga. 290, 291 (1980)). Unless the court or the parties agree to modify the pretrial order before or during trial, "a party may not advance theories or offer evidence that violate the terms of the pretrial order. As noted by one federal court, if pretrial orders are to continue to serve their laudable purposes, 'courts and litigants must take them seriously. A final pretrial order should say what it means, and mean what it says.'" *Dep't of Human Res. v. Phillips*, 268 Ga. 316, 318 (1997) (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 999 (1st Cir. 1990)).

[16] At one of the pretrial hearings in this matter, Malibu's lead trial counsel asked this Court to treat the statements of counsel as admissions in judicio because, among other reasons, a party's attorney is not only that party's agent, but one who has been given express authority to speak on their behalf. Plaintiffs opposed Malibu's request, and the Court granted Malibu's request to submit additional authority. After reviewing that authority, and considering additional authority, the law is clear and Malibu is correct: Statements of fact made by a party's counsel are regarded as admissions in judicio of the party whom they represent. *In Re McCool*, 267 Ga. App. 445 (2004) ("Statements made by a party's counsel during a hearing or trial are regarded as admission in judicio and are binding on the party."); *see also Andrews v. Blue Ridge NH Assocs., LLC*, 353 Ga. App. 75, 83 (2019); *9766, LLC v. Dwarf House, Inc.*, 331 Ga. App. 287, 291 (2015) (same); *Dixon Diary Farms, Inc. v. Conagra Feed Company*, 245 Ga. App. 836 (2000) (same); *State Farm & Cas. Ins. Co. v. Terry*, 230 Ga. App. 12 (1997) (same); and *Bell v. State of Georgia*, 234 Ga. App. 693 (1998) (applying the admission in judicio in the context of pleadings that are drafted by a party's counsel). Admissions in judicio can be binding on a party even when those admissions relate to the status of that party in the case, or of another party to the same case. *See, e.g., JCG Farms of Ala., LLC v. Morgan*, 348 Ga. App. 629, 633 (2019) (admission in judicio binding as to the employment status of the plaintiff).

West, including a carbon monoxide defect beginning in 2005, a throttle defect in 2008, and a flotation defect. *See* Restat. 2d of Torts § 324A; see also *Herrington v. Gaulden*, 294 Ga. 285, 287 (2013) (noting that the Supreme Court of Georgia has "adopted [§324A] as an accurate statement of the common law."). Here, the evidence showed that Malibu LLC undertook the duty of warning the public of defects with Malibu boats that were sold by Malibu West, and Malibu LLC made explicit representations to the public to that effect. *See* Malibu. Pl. Exh. 78 (Deposition Exh. 3) (Malibu LLC CEO Bob Alkema writing to the public after its 2006 purchase of Malibu West, stating "[t]here have been no changes to the staffing at either of our factories, and **things are as they have always been**. The company creed of building the best boats and enjoying our workplace will remain our central focus. We have spent too many years building relationships with our dealers and customers to make a change that could jeopardize our reputation and the results of our hard work." (emphasis added)); *see also, e.g.*, V6-1844 (Malibu employee admitting that its customers reasonably expected it to warn of defects on boats it had already sold); V9-3081 (same, acknowledging Malibu assumed responsibility to warn).

Moreover, Malibu's Chief Financial Officer admitted that Malibu LLC agreed to be responsible for Malibu West's "operating money liabilities," including Malibu West's warranty obligations. V8-2488. The Court finds that alone could have imposed a legal duty on Malibu LLC to warn about safety hazards in products sold by Malibu West. *Farmer v. Air & Liquid Sys. Corp.*, No. 1:16-CV-054 (LJA), 2018 U.S. Dist. LEXIS 51459, at *23 (M.D. Ga. Mar. 28, 2018) (holding that, under § 13 of Restatement of Torts, 3rd, Product Liability, a successor is liable for failing to warn about hazards in a predecessor's product if the successor assumed its predecessor's repair obligations, and a reasonable person in the successor's position would have warned); *see also Deloach v. Rovema*

*Corp.*, 241 Ga. App. 802, 804 (2000) (discussing § 13 as "authority for imposing liability" on a successor for failing to warn); *Corbin v. Farmex, Inc.*, 227 Ga. App. 620, 624 (1997), rev'd on other grounds, *Farmex v. Wainwright*, 269 Ga. 548, 549 (1998) (approvingly citing § 13 as a standard for liability); *Smith v. Ont. Sewing Mach. Co.*, 249 Ga. App. 364, 373-74 n.1 (2001) (noting defendant's actual knowledge of defect would make it potentially liable for § 13's post-sale duty to warn were it "a successor corporation"); *compare with Silver v. Bad Boy Enters., LLC*, 907 F. Supp. 2d 1351 (M.D. Ga. 2012) (no post-sale duty to warn about products sold by predecessor when the successor's purchase agreement expressly rejected any repair or warranty obligations).[17] Since Malibu LLC assumed Malibu West's warranty obligations as they pertained to the subject 2000 Malibu Response LX boat, that means that the boat was under its original warranty both when Malibu LLC purchased Malibu West in 2006, and when Malibu LLC decided in 2011 to issue bow warnings on future—but not previously sold—boats, including the Response LX boats.

**Fourth**, Malibu LLC owed a duty to warn about safety hazards on Malibu boats that were sold by Malibu West before it was purchased by Malibu LLC in 2006. The jury explicitly found that Malibu LLC is a mere continuation of Malibu West, which is an equitable exception to the general rule that a successor entity does not ordinarily assume the liabilities of its predecessor. Malibu LLC is therefore the legal successor of Malibu West, and it is liable for the actions, inactions, negligence, and liabilities of Malibu West. That factual finding by the jury is overwhelmingly supported by the factual record.

---

[17] According to the Malibu Owner's Manual for 2000 Models—which all parties agree is applicable to the Subject Boat—Malibu warrantied certain parts of the boat (including the hull, deck, liner, upholstery frames, and stringers) for "as long as the original purchaser owns the boat." Exh. D-18, p. 53. Jay Jowers purchased the boat from Malibu in 2000, and owned it for 14 years before selling it to Anchorage Marina in 2014. *See, e.g.*, V5-1459-1450.

Multiple Malibu employees conceded at trial that Malibu LLC's purchase of Malibu West merely amounted to a name change, the addition of new investors, and a change to the management structure. Malibu LLC no doubt added certain limited things to Malibu West but, other than that, everything about the former Malibu West remained the same. The testimony of Malibu's employees and executive leadership indicates that all of the owners of West remained owners of LLC under the new structure, the CEO remained unchanged, the previous controlling owner remained on as a director, and Malibu LLC kept **all** of Malibu West's material assets while making the same boats with the same molds at the same factories with the same employees. Moreover, the fact that Malibu LLC was a mere continuation was conclusively established by admissions and comprehensively proved by testimony. *Wilson v. Wernowsky*, 355 Ga. App. 834, 834 (2020) (holding that a new entity was a mere successor of the old even though half the owners of the old entity did not become owners of the new entity and half the owners of the new entity had not been owners of the older entity); *Pet Care Prof'l Ctr. v. Bellsouth Adver. & Publ'g Corp.*, 219 Ga. App. 117, 118 (1995) ("In Georgia, the common law continuation theory has been applied where there was *some* identity of ownership." (italicized emphasis original; citation omitted)); *Ney-Copeland & Assocs., Inc. v. Tag Poly Bags, Inc.*, 154 Ga. App. 256, 256 (1980) (noting that a company was still a mere successor even when it created a new entity to take on new investors who owned half of the new company; citing *Johnson-Battle Lumber Co. v. Emanuel Lumber Co.*, 33 Ga. App. 517 (1925)); *Acme Sec., Inc. v. CLN Props., LLC (In re Acme Sec., Inc.)*, 484 B.R. 475, 487 (Bankr. N.D. Ga. 2012) ("The 'mere continuation' ground for successor liability is a common law doctrine, equitable in its origin and nature ... the substance of the transactions transferring assets to the new corporation must prevail over its form. '[E]quity is loath to elevate the form of the transfer

over its substance, and deigns to inquire into its true nature.'"). Here, there is ample evidence that Malibu LLC was a mere successor of Malibu West, Malibu consented to put the question before the jury, and the jury reasonably found it was a mere successor. This is an independent basis of proof establishing that Malibu LLC owed a duty to warn.

**Fifth**, the Supreme Court of Georgia has indicated a willingness to adopt an expanded version of successor liability for entities that continue a predecessor's product line. The Court has declined to formally adopt the doctrine at its last two opportunities because the unique facts of those cases did not meet all three elements of the product line successor liability test. *See Farmex Inc. v. Wainwright*, 269 Ga. 548, 550 (1998) (lack of evidence that successor continued making the product); *Bullington v. Union Tool Corp.*, 254 Ga. 283, 285 (1985) (same). The Supreme Court has noted approvingly the rationale for this expanded successor liability:

> [I]f the successor corporation continues to manufacture the same type of product, then it, by carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product.

*Farmex*, 269 Ga. at 550. The product line successor liability case generally applies when "(1) the predecessor is liquidated after the transfer, (2) the successor holds itself out to be public as a continuation and produces the same product line, thus having the knowledge needed to weigh the risk of injury, and (3) where the successor is benefiting from the good

will of the prior manufacturer and should also assume the burden for defects in previously sold products." *Bullington*, 254 Ga. at 285.[18]

Here, all those elements have been thoroughly proven: (1) Malibu West ceased operations after the sale, V6-1743-44; (2) Malibu continued making the identical product from 2000 to 2014, V6-2167; (3) and Malibu has heavily relied on the good will of West – including keeping the same public name and models and expressly representing to the public that there were no changes being made and it was the same company they knew and loved. Pl. Exh. 78 (Deposition Exh. 3). This Court finds that the Supreme Court would adopt the product line successor liability case if the elements were satisfied, and they are here, so this is an independent reason that Malibu LLC owed a duty to warn of hazards in the 2000 Response LX.

### 2. Malibu LLC Breached its Duty to Warn

First, Malibu LLC had all the knowledge of West because it kept virtually all the employees, including VP of Product Design Dan Gasper who originally designed the 2000 Response LX. For that reason alone, as explained above, it knew of a hazard posed by the Subject Boat and failed to warn about it from 2006 until the incident in 2014. But it actually had far more knowledge than West. Its conduct admitted knowledge of the defect *and* the failure to warn when it placed bow capacity warning labels on the identical boat from 2011 forward but decided not to warn on prior boats.[19] That decision was made at the highest echelons in the board room despite extensive knowledge of the bow swamping

---

[18] Article 1 of the Agreement of Purchase and Sale between Malibu LLC and Malibu West, entitled "Sale of Assets and Assumption of Liabilities," provides that Malibu LLC purchased "[a]ll goodwill associated with [Malibu West] (except the Excluded Assets)." Exh. D-51, Section 1.01(a)(vii), p. 6. Moreover, Malibu LLC utilized and benefitted from the goodwill of Malibu West by holding itself out as the "same Malibu" as Malibu West.

[19] Malibu argues this was a reasoned decision because it determined it was not liable for boats made by West, but that is a patently unreasonable interpretation for which no evidence was presented. It did not warn of any already sold boats, including ones made from 2006 to 2011. Simply, Malibu just chose not to warn of a known safety defect.

hazard posed by the Response LX and its substantially identical sister boat, the Response LXi. Malibu undertook bow dip tests in 2011 and 2012 and its photos showed the Response LX filed those tests. Additionally, expert testimony established that—even after deciding to warn—its warnings were deficient. The bow swamping defect was so dangerous that no one should have been in the bow when it was underway, and the warning should have said as much. V5-1360-61 (Expert Schofield); V6-1642-44 (Expert Laux).

There was more than enough evidence for the jury to find that Malibu LLC breached a duty to warn of the bow swamping hazard in the 2000 Response LX.

### 3. There was Sufficient Evidence That Malibu's Breaches Caused Ryan's Death

Causation is usually a question for the jury, and this particular case is not a close call. Malibu knew that the bow seating was intended for children, V6-1711; V51339 (called the bow seating the "playpen"), it knew that the swamping defect would put a child in the water where they could contact the propeller, Exh. 137, p. 8.; V5-1368 (a child being tossed overboard was the criteria for bow dip testing), and that contact with the propeller meant certain serious injury or death. Exh. 137, p. 37:

 

*Contact with a spinning propeller can cause injury and death.*

*Do not enter or exit the water when the engine is running (ON) and the propeller is spinning.*

*Do not get on the swim platform when the engine is running.*

*Do not swim towards the back of the boat if the engine is on.*

Simply, Malibu knew the bow-swamping hazard would wash a child out of the bow and into the water beside the boat when the propeller was running, which could cause serious

injury and death. What happened in this case is the exact tragedy that Malibu explicitly foresaw, but consciously chose not to warn users of previously purchased boats about. There is sufficient evidence to support the jury's finding that Malibu caused Ryan's death.

### D. There was Clear and Convincing Evidence of Willful and Wanton Misconduct and That Entire Want of Care Which Raised the Presumption of Conscious Indifference to Consequences

Malibu's argument on this point ignores evidence. The testimony showed that under both the West and LLC regimes, Malibu made multiple repeated conscious decisions to not warn of a known defect for substantially identical boats based only on liability concerns, not safety. Malibu fails to offer any evidence of what "attorney advice" it relied on in its attempt to mitigate the effects of its conduct. The evidence showed that Malibu made serial deliberate decisions to not warn in 2005 when it warned of the swamping defect in substantially identical Response LXis in Australia, but did not warn on the same boats it sold in the United States **and** in 2011 and 2012 when it chose to not warn about the hazard for pre-2011 Malibu Response LXs even though they knew it had the exact same defect as the 2011-forward Malibu Response LXs that it did warn about. Malibu's minutes show that it thought to ask an attorney, but never claims its attorneys told it not to warn. And Malibu's fabrication at the hearing on post-trial motions that it did not warn because it was not a successor is spurious – Malibu did not warn on any previously sold boats, including those sold from 2006 – 2011 during the LLC regime. While the jury might have found that the original design was only negligent (not reckless), it reasonably found that Malibu's repeated decisions to not warn under both the West and LLC regimes were reckless and consciously indifferent to the consequences.

Simply, Malibu *actually knew* of a life-threatening safety hazard with the Response LX, made serial calculated decisions to not warn about it, and still to this day

has refused to make any changes. It mocked its customers as "fatties," refused warnings for "aesthetic reasons," explicitly noted the bow swamping hazard was ejecting children into the water when the propeller was running, but only warned when it thought it was strategic to avoid liability, without any concern for the actual safety of its customers or their children. That conduct was extremely reprehensible, proved by clear and convincing evidence, and the amount of punitive damages was appropriate because of the reprehensibility, the extreme harm, Malibu's worldly circumstances, and the fact Malibu has not relented in its obstinance to this very day.

### E. The Amount of the Punitive Damages Award is Constitutionally Permissible and Appropriate

Malibu next contends that the punitive damages award was grossly excessive and disproportionate under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and under Georgia law. The Court disagrees.

"Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," and "[o]nly when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *BMW of North America v. Gore*, 517 U. S. 559, 568 (II) (116 SCt 1589, 134 LE2d 809) (1996). Courts review a jury's punitive damages award for gross excessiveness under the Due Process Clause by considering three guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U. S. 408, 418 (2003).

Beginning with reprehensibility: "The most important indicium of the reasonableness of a punitive damage award [is] the degree of reprehensibility of the defendant's conduct." *Craig v. Holsey*, 264 Ga. App. 344, 348 (2003). *See BMW of North America*, 517 U.S. at 575, n. 23 ("The flagrancy of the misconduct is thought to be the primary consideration in determining the amount of punitive damages.") (citation and punctuation omitted). In evaluating the reprehensibility of a defendant's conduct, we take into account the following factors:

> whether[ ] the harm caused [***29] was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co.*, 538 U. S. at 419.

Here, Malibu's conduct shows egregious reprehensibility. Malibu is the world's largest ski boat manufacturer but its mocking attitude toward safety concerns and repeated deliberate decisions to not warn of a known hazard to life and safety is worse than the darkest stereotypes of a calloused, consciously indifferent company that weighs human lives in terms of dollars on its profit margins. Its original design process was slipshod, its employees immediately realized the boats were taking water over the bow, its Australian distributor warned them of bow swamping with a substantively identical boat and instead of warning it mocked its customers. In 2011 it implemented bow dip tests that even further emphasized the swamping risks and Malibu started warning new customers of the life-threatening bow swamping defect it knew existed but repeatedly made conscious decisions to not warn existing customers of that hazard. Indeed, Malibu invited customers to put their children in the bow of the boat and the very test that

prompted the warning had as a criteria the known risk that bow swamping would wash a child out. And Malibu's own manual said having someone in the water when the propeller was spinning would cause serious injury or death. Despite all that knowledge, Malibu made serial repeated decisions to not warn, causing this accident.

The next factor for consideration is the ratio of punitive damages to compensatory damages. "The second guidepost is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Craig*, 264 Ga. App. at 349 (citation, punctuation, and emphasis omitted). While the United States Supreme Court has recognized that the ratio of compensatory to punitive damages is a factor to take into account when evaluating whether a punitive damages award is excessive, the Court has explained that "[w]e need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that a general concern of reasonableness properly enters into the constitutional calculus." *BMW of North America*, 517 U. S. at 582-583 (citations and punctuation omitted). "It is not enough, as some have suggested, 'to do the math'; we must also do the reasoning." *Time Warner Entertainment Co. v. Six Flags Over Ga.*, 254 Ga. App. 598, 607 (2002). "The punitive damages award must be viewed in its unique context, in light of the facts of the case and with reference to the actual damages awarded and the potential harm that could have resulted from the defendant's conduct." Id. at 606. It is true that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co.*, 538 U. S. at 425. But they are often approved when the facts of the case justify it. *See Fassnacht v. Moler*, 358 Ga. App. 463, 477 (2021) (approving a 12.5:1 ratio).

The Parties agree that the actual harm suffered by Ryan Batchelder was $80,000,000.00. The Parties disagree about the calculus the Court must use to arrive at a punitive damage value that does not violate the Due Process Clause. More specifically, the Parties' positions are diametrically opposed with regard to how Georgia's apportionment statute should factor into the calculus. Plaintiffs contend that the Court should not consider apportionment when calculating the ratio between the jury's compensatory damage award and its award of punitive damages. Plaintiffs focus on the "harm to the plaintiff" language in the case law, arguing the harm is the total compensatory award pre-apportionment. See *State Farm*, 538 U.S. at 425[20]. Plaintiffs cite the history of American law during which it was generally accepted that a joint tortfeasor was liable for the entire harm to the plaintiff. The Court agrees that apportionment of fault is only a recent statutory creation that inures to a defendant's benefit.

Plaintiffs' approach would calculate the ratio using the individual punitive damages amount against the entirety of the compensatory award ($40M Compensatory: $80M Punitives for Malibu Boats West, Inc., a 1:2 ratio, and $80M Compensatory: $80M Punitives , a 1:1 ratio, for Malibu Boats, LLC). In direct contrast, Defendants' approach would calculate the ratio comparing the individual punitive damages against the compensatory damages as apportioned by the jury ($40M Punitives : $8M Compensatory for Malibu Boats West, Inc, a 5:1 ratio, and $80M Punitives : $12M Compensatory, a 6.667:1 ratio, for Malibu Boats, LLC).

---

[20]Where the Supreme Court states, the "precise award in any case . . . must be based upon the facts and the circumstances of the defendant's conduct and the harm to the plaintiff."

The relevant ratio for due process purposes is "the ratio between the size of the award of punitive damages and the harm *caused by [the defendant's] tortious conduct*"—not other defendants' actions. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 441-42 (2001) (emphasis added). For that reason, multiple courts have squarely rejected Plaintiffs' approach and held that "calculating the punitive-to-compensatory ratio by using the full compensatory award when a defendant is only liable for a portion of the damages is improper." *Lompe*, 818 F.3d at 1068 & n.26 (citations omitted); *accord Clark*, 436 F.3d at 606 n.16; *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. Life Activists*, 422 F.3d 949, 960 (9th Cir. 2005); *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000). Which makes sense, as "a ratio based on the full compensatory award would improperly punish [defendants] for conduct that the jury determined to be the fault of" someone else. *Clark*, 436 F.3d at 606 n.16.

Plaintiffs cite *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196 (11th Cir. 2020) to support their position. However, the 11th Circuit did not adopt or reject the Defendants' position; instead, the Court held that, regardless of how the ratio was calculated, the punitive damages award was not unreasonable. In *Kerrivan*, the jury found the plaintiff 19% at fault under Florida's analogous apportionment of fault framework, but nonetheless conducted the ratio analysis based on the full compensatory award of $15.8 million. *Id.* at 1203.[21] And even with an eight-figure compensatory award,

---

[21] The Court finds the 11th Circuit's decision in *Kerrivan* more persuasive than the 6th Circuit's decision in *Clark v. Chrysler Corp.*, 436 F.3d 594, 607 n.16 (6th Cir. 2006), cited by Malibu. For one, the 11th Circuit is the federal court of appeals that embraces Georgia. *See, e.g., Olds v. State*, 299 Ga. 65, 69 (2016) ("we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit."). Second, as the concurrence in *Clark* noted, punishing a manufacturer "a lesser amount based on its level of comparative fault does not appropriately punish [the manufacturer] for the risk that results from its unsafe design, nor does it serve the goal of deterring similar future conduct by [that manufacturer] . . . The risk from the design defect was the same whether the impact was [the fault of the plaintiff or a nonparty]." *Id.* at 614. Moreover, here, Malibu seeks to escape responsibility because of the fault of a nonparty,

approved a punitive damages ratio of 1.6:1 or 2:1 (depending on how calculated) finding the award did not offend due process. *Id.* at 1210; *see also Bogle v. McClure*, 332 F.3d 1347, 1361-62 (11th Cir. 2003) (noting that punitive to compensatory ratio "in the neighborhood of 4:1" does not violate due process).

Defendants assert that the Court must factor in apportionment when calculating a constitutionally accepted ratio of punitive damages to compensatory damages. Presumably, because Georgia's apportionment statute is relatively new, there is a lack of authority in this context to guide the trial court's application of the statute. Nevertheless, the Court agrees with Defendants' position that apportionment of liability must be applied to arrive at the degree of a defendant's liability before the appropriate and just ratio can be calculated. Though accepting Defendants' argument and formulation, the Court still arrives at the punitive damages amount assessed by the jury.

The Court adopts the post-apportionment approach to the ratio calculation. Under that analysis, the result is single digit ratios (5:1 and ~7:1) that are constitutionally permissible. *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1072 (Fla. Dist. Ct. App. 2010) (concluding that punitive to compensatory ratio of 7.58:1 did not "offend due process"); *Williams v. First Advantage LNS Screening Sols., Inc.*, 238 F. Supp. 3d 1333, 1357 (N.D. Fla. 2017) ("The 13.2:1 ratio of punitive to compensatory damages in this case is not unconstitutionally excessive."). For example, federal courts have approved an $87 million punitive damages award even when the harm suffered by the plaintiff was only $29 million, expressly approving a 3:1 ratio, and awarding $100 million dollars in punitive damages with only $25 million in pre-apportionment compensatory damages.

---

rather than the fault of a plaintiff. There is no incongruity in awarding punitive damages commensurate with the full amount of the harm to a faultless plaintiff.

*See Ccur Aviation Fin. LLC v. S. Aviation, Inc.*, No. 21-cv-60462, 2022 U.S. Dist. LEXIS 14364, at *8 (S.D. Fla. Jan. 25, 2022) ($87M punitive on $29M compensatory **and** treble compensatory damages); *see also Andrews v. Autoliv Japan, Ltd*, Civil Action File No. 1:14-CV-03432-SCJ, *Final Order and Judgment Including Findings of Fact and Conclusions of Law*, Docket Entry No. 534 (December 31, 2021) (awarding $100 million of punitive damages in a product defect case that caused a death where total harm suffered by the plaintiff was about $27 million (~4:1) but the post-apportionment award after deducting the fault of the plaintiff was only about $13.5 million (~8:1). Simply, the ratio, if anything, shows the propriety of the jury's award of punitive damages.

The final guidepost considers the "difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Action Marine, Inc. v. Cont'l Carbon, Inc.*, 481 F.3d 1302, 1322 (11th Cir. 2007) (quotation marks omitted). This guidepost is "accorded less weight . . . than the first two guideposts." Here, there is not even a real concern. Georgia law explicitly allows civil penalties of three times compensatory damages with similar or less evidentiary showing. *See Conseco Fin. Servicing Corp. v. Hill*, 252 Ga. App. 774, 778 (2001) (treble damages for intentional violations of Georgia Fair Business Practices Act). Here, the punitive award was supported by a finding by clear and convincing evidence that Malibu engaged in willful misconduct, wantonness, and that entire want of care that raises the presumption of conscious indifference to consequences. Malibu deliberately and intentionally chose to not warn existing customers of a known hazard to life and health. Indeed, there is no need for a presumption, Malibu's employees testimony showed explicit indifference to consequences, mocking reports of swamped boats in Australia and noting that it was warning new customers but deciding nonetheless to not warn existing customers. Simply,

the award of punitive damages was well within the protections of due process considering all factors.

The Georgia analysis is similar. *See Fassnacht v. Moler*, 358 Ga. App. 463, 480 (2021). Here, there was a threshold showing sufficient for an award of punitive damages, strong evidence of reprehensibility, and no evidence of bias or impropriety. The Court likewise finds that the award of punitive damages was appropriate under Georgia law.

There was no error in the jury's punitive damages award.

### F. There is No Basis for a New Trial

Malibu argues in the alternative that it should receive a new trial because of various rulings by the Court. But it fails to show any error or harm. Each argument is considered in turn.

#### 1. There was No Error in Admitting Testimony About *Bell v. Mastercraft*; It was Admitted Because it Was How Malibu Pervasively Explained its Decision to Test and Warn, and the Court Explicitly Ruled it Was Not Admitted as an OSI

Malibu LLC seeks to relitigate motions *in limine* that the Court spent hours reviewing and conducting hearings on, and that the Court ruled upon long ago. Malibu offers no new justifications, it shows no error, and, in any event, it has waived many of its arguments. To begin, this Court was clear that *Bell* would not come in as a similar incident. *See* December 10, 2020, Order on MIL No. 16 ("lay or expert witnesses can discuss the *Bell v. Mastercraft* case to the extent that the witness will **not discuss this case as being *substantially similar* to the incident subject to this litigation**" (emphasis added)). *Bell* was relevant to this case because Malibu employees explicitly referenced it to explain why Malibu created the bow-dip test and began putting bow

capacity warning labels on its boats. At trial, Malibu never objected that this motion *in limine* was violated, nor did it ask for any kind of limiting instruction after any witness testimony or attorney argument about *Bell*. For that reason, Malibu has waived any argument on that ground. *Williams v. Harvey*, 311 Ga. 439, 451 (2021) ("a contemporaneous objection is **required** when the moving party believes a motion in limine has been violated" (emphasis added)).[22] There is no error here.

In actuality, Malibu itself violated the Court's order on motion *in limine* no. 16. The Court expressly held that no one was to suggest this case or *Bell v. Mastercraft* was a "drunk driver" case and Malibu tried to do exactly that. *See* February 19, 2021, Order on MIL No. 16, at pp. 5-6 ("Plaintiffs move to exclude any such statements [including "drunk driver"] from any source, including lay and expert witnesses.... Plaintiffs' motion *in limine* no. 16 ... is GRANTED."). Malibu's attempt to claim some ambiguity in the Court's orders is unavailing. The typo in the order in motion *in limine* no. 15 was from the proposed order that it drafted. V3-754-55. And the Court was clear at the hearing and its orders that *Bell* would only be discussed in historical context and would not become a sideshow about

---

[22] In its supplemental brief and at the hearing, Malibu LLC argued that the Plaintiffs used the testimony of their warnings expert, Dr. Lila Laux, to "convey the false impression that [*Bell* and this case] were similar." In doing so, it cites the following testimony of Dr. Laux: "In the *Bell* case, something similar happened is my understanding, and the Malibu folks decided that they needed to respond to that in some way, and they started to develop a warning." V6-1641. Malibu takes issue with Dr. Laux's use of the word "similar." To begin with, Malibu raised only three objections during Dr. Laux's testimony, two of which were sustained, and one of which Plaintiffs voluntarily agreed to correct. V6-1646-1647, 1696. None of the matters that Malibu objected to are related to Malibu's contention here. *Id.* Malibu LLC's argument on this issue is therefore waived. *Williams*, 311 Ga. at 451. Even if it were not waived, however, Malibu's argument lacks merit. The record is clear that Plaintiffs did not seek to elicit that testimony from Dr. Laux. Their question of Dr. Laux was simple: "In reading through the Malibu documents and depositions, did you become familiar with the *Bell* versus MasterCraft case and Malibu's response to that case?" V6-1640-1641. The full context of that testimony therefore does not evidence an attempt "to convey the false impression that the two incidents were similar." Rather, it shows an unsolicited and fleeting mention of the word "similar" that immediately moved into broader testimony about the effect that *Bell* had on Malibu, the very kinds of things that Malibu employees testified to at trial. Finally, from a purported harm perspective, there is little difference between the use of the word "similar" above, and Malibu's use of that word in relation to *Bell* in its opening statement: "I do want to talk briefly about the Malibu MasterCraft [sic] and how it was portrayed in Mr. Fountain's opening. That, you know, you can . . . you may say, okay, that's a similar case." V3-751. In sum, there was no error regardless of the fact that Malibu did not object.

its facts and any insinuations from them. *See* February 19, 2021, Order on MIL No. 16, at pp. 5-6.

### 2. A Lack of Similar Incidents Was Properly Excluded Because Malibu Failed to Prove Non-Incidents Occurred Under Substantially Similar Circumstances

Malibu also assigns error to the Court's order excluding its argument about a lack of other incidents. This matter came before the Court on Plaintiff's Motion in Limine No. 6. The issue arose due to a line of testimony offered by a few Malibu employees, which was best exemplified by Malibu CEO Jack Springer: "... through thousands of boats we have sold of that nature, through tens of thousands of people that have driven it, to hundreds of thousands of hours on that boat and that model of boat, we never had a problem." Docket No. 730, Deposition of Jack Springer, p. 35. The Plaintiffs contended that (1) the probative value of the evidence was far outweighed by the danger of unfair prejudice and confusion of the issues, and (2) Malibu had no evidence that its boats were being operated in a substantially similar manner, and under substantially similar conditions, when any particular use of a substantially similar Malibu boat did not result in a swamping incident.

As to the first issue, when Plaintiffs followed up on Malibu's analysis about this issue, Mr. Springer admitted that Malibu did not know how often customers use their boats, how long they use them, how they use them, when they use them, or in what manner they use them. *See* Docket 730, Springer Dep., pp. 35-36; Docket No. 729, Deposition of Dan Gasper, p. 107. Mr. Springer further admitted that Malibu has no way of knowing any sort of data about how users or customers use Malibu boats. Docket 730, Springer Dep., pp. 35-36. In addition, Mr. Springer conceded that Malibu had never sought to learn about incidents of any kind, including swamping incidents, in any of their

boats. *Id.* at 43-44. Instead, Malibu employees testified that their sole source of information about the lack of any other incidents is that it has no record of any such incident being reported. *See, e.g., id.* And Malibu's employees expressed confidence any user or customer who experienced swamping would report it directly to Malibu. *See, e.g., id.*

But a sober analysis of the evidence in this case demonstrates how problematic that is here. When pressed about whether there have truly never been any reported incidents of swamping, Mr. Springer testified: "Not to my knowledge." *Id.* at 43; *see also* 43-44. And therein lies part of the problem. Malibu does not keep records of incidents and it does not take any steps to learn about them, or about how its boats perform in the real world. *See, e.g.,* Docket 729, Gasper, pp. 76-78; Docket 730, Springer Dep., pp. 43-44; Docket No. 719, Deposition of Mark McLemore, p. 33. And this bore out in the evidence. Malibu did not review organized and publicly available data to learn about whether its boats were involved in swamping incidents (or other kinds of incidents) even though it was aware of its ability to do so.[23] *See, e.g.,* Docket 729, Gasper, pp. 204-05.

Mr. Springer testified that he believed that there was nothing about Malibu swamping incidents in the database because he hadn't heard that anyone reported one to Malibu. Docket 730, Springer Dep., pp. 249-50. Yet there are numerous instances of Malibu boats swamping in the BARD database. Docket 564, Exhibit 7, Deposition of Gary Polson, pp. 80-81. And there were numerous instances in discovery where Plaintiffs presented instances of others swamping incidents to Malibu and Malibu employees knew

---

[23] The U.S. Coast Guard keeps the Boat Accident Report Database (called the BARD database) that can be accessed by the public. It includes reports of boating incidents from participating states that results in $2,000 or more in property damage, injury, death, or disappearance. This included swamping incidents. The BARD database is considered to be the best source of publicly available data on boating, and it is available to anyone online.

nothing about it. That was true even when the information about those incidents came from internal Malibu e-mails, Docket 729, Gasper, pp. 167-68, 200-01, and from an online forum set up by Malibu itself called the Malibu Crew website. Docket 730, Springer Dep., pp. 186-87. In fact, a 2007 swamping incident in Ohio involving a 2004 Response LXi resulted in a young boy, who was wearing a life jacket, being washed out of the bow, going into the path of a spinning propeller, and being killed. The incident was reported in the news as well as the BARD database, but Malibu had never heard about it.[24] Docket 729, Gasper, pp. 205-06.

Given the effect that this kind of evidence can have on a jury, courts should undertake to understand, as best as they can, how reliable the evidence is, whether the evidence could mislead the jury, and whether (and to what extent) the probative value of the evidence is outweighed by the danger of unfair prejudice. The Court did just that here, and concluded that, given the nature of the evidence upon which the testimony of Malibu employees here is based, the probative value of the evidence is low. Moreover, the danger of unfair prejudice, confusing the issues, and misleading the jury was extremely high.

Separate and apart from the Court's concerns under O.C.G.A. § 24-4-403, the Court must also consider the issue of substantial similarity. Before admitting any evidence about other incidents, the proponent of the evidence must prove, and the trial court must determine, that the other incidents are substantially similar to the incident at issue in the trial. It has been long established in Georgia that, "[w]hile the relevancy of other occurrences is ordinarily within the sound discretion of the court, it is necessary that the conditions of the things compared be substantially similar." *Carlton C. v. Poss*, 124 Ga.

---

[24] Plaintiffs sought to put up evidence of this matter as another similar incident in this case. For the reasons set forth in the Court's Order on that issue, the Court granted Malibu's Motion to Exclude that evidence.

App. 154, 155 (1971) (quotation omitted). "Without a showing of substantial similarity, the evidence [of other occurrences or a lack thereof] is irrelevant as a matter of law and there is nothing upon which the court's discretion can operate." *Id.*

The same analysis and legal principles apply where a party seeks to introduce evidence of other similar incidents themselves, or a lack thereof. If evidence of prior acts is not admissible, the evidence of the absence of such acts is equally inadmissible. For instance, in *Williams v. Naidu,* 168 Ga. App. 539 (1983), the Court of Appeals reversed the trial court for allowing defendant doctors to testify that they had never been negligent in providing medical treatment because it supported a presumption that they complied with the standard of care in the facts giving rise to that lawsuit. This, according to the Court of Appeals, would amount to improperly admitted evidence adversely affecting the judgment of the jury. The Court of Appeals further reasoned that, "[i]f evidence of prior similar acts of negligence is not admissible, it follows that evidence of the absence of any such prior acts is equally inadmissible." *Williams,* 168 Ga. App. at 540.[25]

Federal and state courts addressing the admissibility of evidence concerning the absence of prior accidents have recognized that the probative value of such evidence is determined in large measure by the foundation laid by the offering party. *See Forrest v. Beloit Corp.,* 424 F.3d 344, 356 (3rd Cir. 2005). In *Espeaignnette v. Gene Tierney Co.,*

---

[25] *Browning v. Paccar, Inc.,* 214 Ga. App. 496 (1994), cited by Malibu, is inapposite. It stands for the proposition that it is not an abuse of discretion to admit a lack of other similar incidents when the defendant is able to meet its evidentiary threshold of proving substantial similarity. *Id.* at 498. Here, despite being given opportunities to do so, Malibu put forth no such evidence whatsoever. Malibu also cites *Evershine Prods., Inc. v. Schmitt,* 130 Ga. App. 34, 38 (1973) in support of its argument that it is error to exclude evidence about a lack of other incidents. But that is not the holding of *Evershine.* Rather, the evidence of other manufactures not warning "was offered for the purpose of showing that others who made a similar product did not place warnings on their labels as to the danger of extended exposure to the undiluted or insufficiently diluted product to be considered solely on the question of defendant's alleged negligence in not having a warning on its label." *Id.*at 38. But no such evidence was excluded here. Rather, the evidence here was that other ski boat manufacturers applied on-product warnings about potential bow swamping hazards, including Malibu beginning in the early 2000s.

43 F.3d I, 10 (1st Cir. 1994), the First Circuit observed that as a general rule, "evidence of the absence of prior accidents may not be admitted unless the offering party first establishes that the 'lack of accidents was in regard to products that are substantially identical to the one at issue and used in settings and circumstances sufficiently similar to those surrounding the machine at the time of the accident.'" (quoting *Klonowski v. International Armament Corp.,* 17 F.3d 992, 996 (7th Cir. 1994)). Accordingly, most courts admitting evidence of the absence of prior accidents in product liability cases have done so only where a witness has testified that: (1) a significant number of substantially identical products have been used in similar circumstances over a period of time; (2) the witness would likely be aware of prior incidents involving these products; and (3) to the witness's knowledge, no such prior accidents have occurred. *See Forrest,* 424 F.3d at 355-56.

The reasoning, analysis, and legal principles of *Williams* and *Hasenauer* are applicable to this case. In order to satisfy foundational requirements to refer to an absence of prior incidents, Malibu would have to show substantial similarity. *See Hockensmith v. Ford Motor Company,* No. 03-13729, 2004 WL 1799628 (11th Cir. Aug. 5, 2004) (unpublished opinion) (both parties are required to show substantial similarity to admit other similar incident evidence; district court erroneously allowed Ford's expert to present statistical evidence of thousands of accidents involving Ford Explorers without any showing of substantial similarity to the subject incident).

Here, Malibu was given ample opportunity to come forth with evidence proving the substantial similarity of the instances of Malibu boat use where bow swamping incidents did not occur. Malibu failed to do so. Moreover, the testimony of Malibu's employees on this issue demonstrates that Malibu likely would not be aware of prior

similar incidents. The Court therefore granted Plaintiffs' motion to exclude the evidence because Malibu did not put forth any evidence to meet its burden of proving substantial similarity. The Court, however, expressly allowed experts to review this information, rely on it as a foundation for their opinions, and testifying about the foundation of their opinions at trial; at which point Plaintiffs could test the reliability of those opinions, or that information, through cross-examination. Transcript of the Hearing on February 26, 2020, p. 126. Moreover, the Court expressed that it was open to revisiting the issue again if Malibu could develop evidence to meet the substantial similarity test, but Malibu never came forward with any such evidence. *See id.*

The Court's decision was sound, and Malibu never made another attempt to proffer evidence of that substantial similarity, rendering its claim of error unavailing. There was likewise no error here.

### 3. The Court Properly Exercised Its Discretion to Deny Malibu's Attempt to Backtrack Its Stipulations

The Court already explained its finding and holding above that Malibu did not make any mistake in agreeing to the stipulations, and that Malibu's trial counsel intended to enter a stipulation consistent with its admissions in judicio and years of litigation conduct that the Malibu entities were collectively manufacturers for purposes of this product liability action. For that and other reasons, the Court did not let Malibu out of its stipulations.

Malibu bore the burden of proving amendment is necessary to prevent "manifest injustice." O.C.G.A. § 9-11-16 (b); *see Ballard v. Meyers*, 275 Ga. 819 (2002) (holding that party seeking to amend pretrial order bore the burden to show amendment was "necessary to prevent manifest injustice" (citations omitted)).

Malibu did not seek just any amendment; it sought an amendment to withdraw a stipulation. That request has additional implications, because a stipulation in a pleading signed and submitted by Malibu's counsel is, in substance, a binding admission. A stipulation "is not only binding as a part of the pretrial order, but so long as it is before the court it is binding because it is a stipulation by the parties upon which a resolution of the issue was to be made, and was binding even though it might in some manner contradict or conflict with the pleadings." *Goolsby v. Allstate Ins. Co.*, 130 Ga. App. 881, 883 (1974); *Long v. Marion*, 257 Ga. 431, 431 (1987) ("A pretrial order limits the issues for trial to those not disposed of by admissions or agreements of counsel.").

The standard for withdrawing an admission is well-established.

> After a matter has been deemed admitted by operation of law, the trial court may, in its discretion, permit a party to withdraw an admission **if** the court determines that (1) the presentation of the merits will be subserved by the withdrawal, **and** (2) the party obtaining the admission fails to satisfy the court that withdrawal will prejudice him in maintaining his action or defense on the merits.

*Fox Run Props., LLC v. Murray*, 288 Ga. App. 568, 570 (2007) (emphasis added; discussing in O.C.G.A. § 9-11-36 context).

Malibu's main argument for getting out of the stipulations was that it agreed to them by "mistake." But making that claim does not make it so. There is, rather, Supreme Court precedent on what Malibu was required to prove. "Absent **clear, unequivocal** and **decisive** evidence as to the mistake, relief on grounds of mistake will **not** be granted. *Roberts v. Gunter*, 251 Ga. 276, 277 (1983) (emphases added).

Thus, Malibu bore the burden to prove with clear, unequivocal, and decisive evidence that the stipulation was a **mistake**, and prove that the **merits will be served** by allowing Malibu to withdraw the admission/agreement, that the **Plaintiffs' will not**

**be prejudiced** by the withdrawal, and that permitting the withdrawal is **necessary to prevent a manifest injustice**. *See* O.C.G.A. § 9-11-16(b); *Ballard*, 275 Ga. at 819; *Murray*, 288 Ga. App. at 570.

Malibu failed to prove any of those things. As already covered, there was no mistake. And despite half a decade of litigating this case as the Malibu Defendants, the Malibu Defendants sought to escape a relied-upon, agreed-to stipulation that accurately, and efficiently, summarized the facts of this case.

Specifically, Malibu wants to undo this pair of stipulations:

a. Malibu Boats LLC, Malibu Boats, Inc., and Malibu Boats West Inc., collectively the Malibu Defendants, designed, manufactured and sold the subject 2000 Response LX boat and were engaged in the business of designing, manufacturing and selling recreational boats.

b. The subject boat is a 2000 model year Malibu Response LX open bow boat that was manufactured by the Malibu defendants at their Loudon Tennessee plant in February of 2000.

But this pair of stipulations establishes the routine, well-documented fact that the Malibu Defendants are the entities responsible for the design and warnings for the boat that was involved in the subject incident. That fact was so pervasive that despite many dozens of motions and hundreds of pleadings over the life of the case, Malibu never moved for summary judgment on that ground and, instead, conclusively admitted the opposite. A number of similar admissions are documented herein, *supra*.

The reason for that persistent collective defense is quite clear for the reasons outlined above. Malibu and its employees understood that they had assumed the duty to warn from early models of Malibu boats and they understand that LLC was just a mere continuation of the same business – "really, all that changed was the name of the company." V8-2620 (question answered in the affirmative). The stipulation is consistent

with the actual facts of the case, and withdrawing it would not have served the merits. Besides, because it was an admission it was admissible against Malibu even if withdrawn. *Walker v. Sutton*, 222 Ga. App. at 641 ("Even if Sutton had been entitled to withdraw his admissions and amend his answer and the pretrial order, in so doing, jury questions would have been created. Admissions formally withdrawn from the pleadings are no longer solemn admissions in judicio; **nevertheless, a jury may accord them credence and effect upon the trial of a case.**" (emphasis added))  There is no reasonable debate concerning the prejudice Plaintiffs would have suffered had the Court allowed Malibu to withdraw its position – one that Plaintiffs had relied upon for years throughout the litigation.

Even if Malibu's agreement to the stipulations was a mistake – which, again, it was not – Malibu failed to meet its burden to prove modification of the pretrial order was necessary to prevent manifest injustice. The stipulation was consistent with the evidence, the depositions, the trial testimony, the admissions of Malibu employees and its counsel, and the litigants' positions over the last five years.

There was no error in denying Malibu's motion to amend the pretrial order.

### 4. The Court Properly Excluded Malibu's Attempt to Contradict Its Stipulation; Malibu Was Not Prevented From Arguing Against Successor Liability

This ground likewise fails. The Court did **not** prevent Malibu from arguing successor liability, it only prevented it from contradicting the stipulation that LLC was a manufacturer. V10-3357 ("Mr. Shannon is intentionally trying to introduce evidence to the jury that contradicts the **stipulation** that they agreed to before trial, which is that the three defendants collectively designed, manufactured, and sold the boat."), 3358 ("The issue [successor liability] is about holding another defendant liable. Right now, the

defendants apportion to [sic] fault. That is what successor liability is about. It has nothing to do with the stipulation."). Malibu was free to argue it should not be liable for any fault attributed to West, which was the reason the parties had agreed to put the successor liability question on the verdict form since they could not agree about putting all Malibu entities on the same line on the verdict form. V10-3358. The Court properly prevented Malibu from contradicting the stipulations but allowed it to argue that the jury should check "no" on successor liability so that LLC would not be held liable for any fault apportioned to West. What Malibu says happened did not happen; there was no error here.

## IV.    CONCLUSION

For the reasons explained above, Malibu's Motion for Judgment Notwithstanding the Verdict, or in the Alternative for a New Trial, is **DENIED** in full.

**SO ORDERED** this _____18th_____ day of July, 2022.

_B. Ch. Caudell_

HON. B. CHAN CAUDELL
JUDGE, SUPERIOR COURT OF RABUN COUNTY
MOUNTAIN JUDICIAL CIRCUIT